JOHN BRISCOE AND OTHERS V. THE PRESIDENT AND DIRECTORS OF THE BANK OF THE COMMONWEALTH OF KENTUCKY.

On the 29th of November, 1820, the legislature of Kentucky passed an act, establishing a bank, by the name of "The Bank of the Commonwealth of Kentucky." The first section of the act, declares the bank shall be established " in the name and behalf of the Commonwealth of Kentucky;" under the direction of a president and twelve directors, to be chosen by the legislature. The second section enacts, that the president and directors shall be a corporation, capable of suing, and being sued, and of purchasing, and selling every description of property. The third section declares the bank to be, exclusively, the property of the commonwealth. The fourth section authorizes the issuing of notes: and the fifth declares the capital to be two millions of dollars; to be paid by all moneys afterwards paid into the treasury for the vacant lands of the state, and so much of the capital stock as was owned by the state in the Bank of Kentucky; and as the treasurer of the state received those moneys, he was required to pay them into the bank. The bank had authority to receive money on deposite, to make loans on good personal security, or on mortgage; and was prohibited increasing its debts beyond its capital. Limitations were imposed on loans, and the accommodations of the bank were apportioned among the different counties of the state. The bank was, by a subsequent act, authorized to issue three millions of dollars; and the dividends of the bank were to be paid to the treasurer of the state. The notes of the bank were issued in the common form of bank notes; in which the bank promised to pay to the bearer on demand, the sum stated on the face of the note. The pleadings excluded the Court from considering that any part of the capital had been paid by the state; but in the argument of the case, it was stated, and not denied, that all the notes which had been issued, and payment of which had been demanded, had been redeemed by the bank. By an act of the legislature of Kentucky, it was required that the notes of the bank should be received on all executions by plaintiffs, and if they failed to endorse on such execution, that they would be so received, further proceedings on the judgment were delayed for two years. The Bank of the Commonwealth of Kentucky instituted a suit against the plaintiffs in error, on a promissory note for which the notes of the bank had been given, as a loan, to the drawers of the note. The defendants in the suit claimed that the note given by them was void, as the same was given for the notes of the bank, which were " bills of credit" issued by the state of Kentucky; against the provisions of the constitution of the United States, which prohibits the issuing of " bills of credit" by the states of the United States: and that the act of the legislature of Kentucky, which established the bank, was unconstitutional and void. By the Court.—The act incorporating the Bank of the Commonwealth of Kentucky, was a constitutional exercise of power, by the state of Kentucky; and the notes issued by the bank are not bills of credit, within the meaning of the constitution of the United States.

The definition of the terms "bills of credit," as used in the constitution of the United States, if not impracticable, will be found a work of no small difficulty.

VOL. XI.—2 K

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

The terms bills of credit, in their mercantile sense, comprehend a great variety of evidences of debt, which circulate in a commercial country. In the early history of banks, it seems their notes were generally denominated "bills of credit;" but in modern times they have lost that designation, and are now called either bank bills, or bank notes. But the inhibitions of the constitution apply to bills of credit, in a limited sense.

Description of the bills of credit which were issued in the early history of the colonies, afterwards, the United States of America.

The case of Craig v. The State of Missouri, 4 Peters, 410, cited.

The definition of a bill of credit, which includes all classes of bills of credit emitted by the colonies and states, is a paper issued by the sovereign power, containing a pledge of its faith, and designed to circulate as money.

If the legislature of a state attempt to make the notes of any bank a tender, the act will be unconstitutional; but such attempt could not affect, in any degree, the constitutionality of the bank. The act which related to the receiving the notes of the Bank of the Commonwealth of Kentucky, was not connected with the charter.

The federal government is one of delegated powers : all powers not delegated to it, or inhibited to the states, are reserved to the states or to the people.

A state cannot emit bills of credit, or in other words, it cannot issue that description of paper to answer the purposes of money, which was denominated before the adoption of the constitution, bills of credit. But a state may grant acts of incorporation for the attainment of these objects, which are essential to the interests of society. This power is incident to sovereignty; and there is no limitation on its exercise by the states, in respect to the incorporation of banks, in the federal constitution.

At the time of the adoption of the constitution, the "Bank of North America," and "the Massachusetts Bank," and some others, were in operation. It cannot therefore be supposed that the notes of these banks were intended to be inhibited by the constitution, or that they were considered as "bills of credit," within the meaning of that instrument. In many of their most distinguishing characteristics, they were essentially different from bills of credit, in any one of the various forms in which they were issued. If then the powers not delegated to the federal government, nor denied to the states, are retained by the states or the people; and by a fair construction of the terms "bills of credit," as used in the constitution, they do not include ordinary bank notes; it follows, that the powers to incorporate banks to issue these notes may be exercised by a state.

A uniform course of action, involving the right to the exercise of an important power by the state government for half a century, and this almost without question; is no unsatisfactory evidence that the power is rightfully exercised.

A state cannot do that, which the federal constitution declares it shall not do. It cannot "coin money." Here is an act inhibited in terms so precise, that they cannot be mistaken. They are susceptible but of one construction. And it is certain that a state cannot incorporate any number of individuals, and authorize them to coin money. Such an act would be as much a violation of the constitution, as if money were coined by an officer of the state under its authority. The act being prohibited, cannot be done by a state, directly or indirectly. The same rule applies to bills of credit issued by a state.

To constitute a bill of credit within the constitution, it must be issued by a state, on the faith of the state, and designed to circulate as money. It must be a paper which circulates on the credit of the state; and so received and used in the ordinary

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

business of life. The individual or committee who. issue it, must have power to bind 'the state; they must act as agents, and of course not incur any personal responsibility, nor impart, as individuals, any credit to the paper. These are the leading characteristics of a bill of credit, which a state cannot emit. The notes issued by the Bank of the Commonwealth of Kentucky have not these characteristics.

When a state emits bills of credit, the amount to be issued is fixed by law; as also the fund out of which they are to be paid, if any fund be pledged for their redemption: and they are issued on the credit of the state, which in some form appears upon the face of the notes, or by the signature of the person who issues them.

No sovereign state is liable to be sued without her consent. Under the articles of confederation, a state could be sued only in cases of boundary. It is believed that there is no case where a suit has been brought, at any time, on a bill of credit against a state; and it is certain that no suit could have been maintained on this ground, prior to the constitution.

The case of Craig v. The State of Missouri, 4 Peters, 410, is not authority to sustain the claim that the notes of the Bank of the Commonwealth were bills of credit. The decisions in that case applied to obligations of an entirely different character.

There is no principle decided by this Court, in the case of Craig v. The State of Missouri, which at all conflicts with the views presented by the Court in this case. Indeed the views of the Court are sustained and strengthened, by contrasting the present case with that.

The case of the Bank of the United States v. The Planters Bank of Georgia, 9 Wheat. 904, cited.

The case of the Bank of the Commonwealth v. Wister and others, 2 Peters, 315, cited.


IN error to the court of appeals of the state of Kentucky.

In the Mercer circuit court of the state of Kentucky, the president and directors of the Bank of the Commonwealth of Kentucky, on the 15th of April, 1831, filed a petition of debt, stating, that they hold a note upon the defendants, George H. Briscoe, Abraham Fulkerson, Mason Vannoy, and John Briscoe, in substance as follows, to wit: "2,048 dollars 37 cents. One hundred and twenty days after date, we jointly and severally promise to pay the president and directors of the Bank of the Commonwealth of Kentucky, or order, 2,048 dollars 37 cents, negotiable and payable at the branch bank at Harrodsburg, for value received. Witness our hands, this 1st of February, 1830.

"G. H. BRISCOE,
A. FULKERSON,
MASON VANNOY,
JOHN BRISCOE."

[*Briscoe* v. *The Bank of the Commonwealth of Kentucky.*]

The defendants appeared and filed the following pleas: " The defendants, after craving oyer of the note, and the same being read to them, say, that the note was executed on no other or further consideration than that of another note which had been previously executed by them to the plaintiffs, for a certain sum, negotiable and payable at the branch of the said bank at Harrodsburg, and that the note so previously executed, was executed by them in no other or further consideration than that of the renewal of another note of the like tenor; and the defendants aver, that previous to the time of executing the note last mentioned, the legislature of the commonwealth of Kentucky, in the name and on behalf of the said commonwealth, by an act which passed on the 29th of November, 1820, established a bank, the capital stock of which was declared to be 2,000,000 dollars, which said capital stock the said bank never received, or any part thereof, as these defendants aver; that by the provisions of said act, the president and directors of the said bank and their successors in office, were declared and made a corporation and body politic, in law and fact, by the name and style of " The President and Directors of the Bank of the Commonwealth of Kentucky;" that, also, by said act, the president and directors of the said bank were illegally, and contrary to the provisions of the constitution of the United States, empowered and authorized, for and on behalf of the said commonwealth, and upon her credit, to make bills of credit, to wit: bills or notes to an amount not exceeding 2,000,000 dollars, signed by the president and countersigned by the principal cashier, promising the payment of money to any person or persons, his, her, or their order or to the bearer; and the said bills or notes were so made illegally, in violation of the said constitution, to emit, issue, and circulate through the community, for its ordinary purposes, as money; that under the authority of the said act of the legislature, and in violation of the said constitution of the United States, the said president and directors had, before the date of the note last aforesaid, for and on behalf of the commonwealth, and on her credit, made various bills of credit, to wit: notes of various denominations, in amount from one to one hundred dollars, signed by the president of the said bank, and countersigned by the principal cashier, promising therein and thereby to pay the person in each note mentioned, or bearer, on demand, the amount therein mentioned in money, and were transferable on delivery; and that for the purpose of circulating said notes through the community for its ordinary purposes

as money, the legislature of the said commonwealth, by an act passed on the 25th of December, in the year 1820, had, amongst other things, provided and declared, in substance, that upon all executions of fieri facias which should be thereafter issued from any of the courts of the said commonwealth, endorsed, that notes on the Bank of Kentucky or its branches, or notes on the Bank of the Commonwealth of Kentucky or its branches, "might, by the officer holding such execution, be received from the defendant in discharge thereof." Such executions, so endorsed, should only be replevied and delayed in their collection for the space of three months; but that all executions of fieri facias, which should thereafter be issued from any of the courts of the said commonwealth, without any endorsement for the reception of notes on the Bank of Kentucky or its branches, or notes on the Bank of the Commonwealth of Kentucky or its branches, should be replevied and delayed in its collection for the space of two years, or, if not so replevied, that property levied upon under the same should be sold upon a credit of two years.

The said president and directors for the like purpose, and with the like intent, afterwards, to wit, on the       day of    , (that being the date of the note executed by the defendants last abovementioned,) did, for and on behalf of the said commonwealth, for her benefit, and on her credit, illegally, and contrary to the said constitution of the United States, emit and issue the notes or bills of credit so made as aforesaid by the president and directors of said bank, to the amount of 2048 dollars 37 cents, by loaning at interest, and delivering the same to the defendant Briscoe. And the defendants in fact aver that the only consideration for which the note last abovementioned was executed by them, was the emission and loan of the said bills of credit, so made and issued as aforesaid to said Briscoe by the plaintiffs, who are the president and directors of the bank aforesaid, whereof they say that the consideration of the said last abovementioned note, executed by them, was illegal, invalid, and in violation of the constitution of the United States; and that each of the notes thereafter executed by them as aforesaid, by way of renewal as aforesaid, of the said last abovementioned note, was also founded upon the illegal, invalid, and insufficient consideration aforesaid, and none other; and this they are ready to verify and prove; wherefore they pray judgment, &c.

And the defendants, for further plea in this behalf, say, that the plaintiffs, their action aforesaid against them ought not to have and

maintain, because they say that the only consideration for which the note in the petition mentioned was executed, was the renewal of a note which had been previously executed by them to the plaintiffs for the sum of 2048 dollars 37 cents, negotiable and payable at the branch of the Bank of the Commonwealth of Kentucky, located at Harrodsburg. And they aver that, previous to the date of the note so renewed as aforesaid, the plaintiffs, under the provisions, and by the authority of the act of the legislature. of the commonwealth of Kentucky, establishing the Bank of the Commonwealth of Kentucky, approved the 29th day of March, 1820, and contrary to that provision of the constitution of the United States which inhibits any state from emitting bills of credit, had, on behalf of the said commonwealth, and upon her credit, made various bills of credit, signed by the president of said Bank of the Commonwealth of Kentucky, and countersigned by the principal cashier therein; and thereby promising to pay to the person in each of said bills mentioned, or bearer, on demand, the respective amounts in each of said bills expressed, in money; and the said bills so made and signed by the said president and cashier, the plaintiffs, afterwards, to wit: on the day of the date of the note last aforesaid, for the purpose of circulating the said bills of credit, so as aforesaid made, through the community as money, did, for and on behalf of the said commonwealth, and for her benefit, and upon her credit, illegally, and contrary to the aforesaid provisions in the constitution of the United States, emit and issue said bills of credit so made as aforesaid, to the amount of 2048 dollars 37 cents, of the said bills, by loaning and delivering the same to the defendant, Briscoe, at interest, reserved and secured upon said loan, for the benefit of the said commonwealth, at the rate of six per centum per annum upon the amount aforesaid; and the defendants, in fact, aver that the only consideration for which the note last abovementioned was executed by them, was the emission and loan of the said bills of credit, so issued as aforesaid, by the plaintiffs to the defendant, Briscoe. And so they say the consideration of the said last mentioned note was illegal, invalid, and in violation of the constitution of the United States; and that the consideration of the note sued on, executed by these defendants in renewal of the said last mentioned note as aforesaid, is likewise illegal, invalid, and contrary to the constitution of the United States; and this they are ready to verify and prove: wherefore they pray judgment, &c.

To these pleas the plaintiffs demurred, and the defendants joined

in the demurrer. The circuit court of Mercer county gave judgment for the plaintiffs; and the defendants appealed to the court of appeals of Kentucky.

In the court of appeals, the following errors were assigned by the appellants.

1. The court erred in sustaining the demurrer of the defendant in error, to the first plea of the plaintiffs in error.

2. The court erred in sustaining the demurrer to the second plea.

3. The decision of the court upon each demurrer, as well as in rendering final judgment against plaintiffs in error, is erroneous and illegal.

On the 5th day of May, 1832, the court of appeals affirmed the judgment of the circuit court.

That court delivered the following opinion:—

" We are called upon in this case to readjudicate the question of the constitutionality of the bank of the Commonwealth; and its right to maintain an action upon an obligation given in consideration of a loan of its notes. We consider this question as having been settled in the case of Lampton against the Bank, 2d Litt. 300. If it be true, as contended in argument on behalf of the appellants, that the question is presented on the face of the charter, that case has been incidentally recognised and confirmed by an hundred cases that have since passed through this court."

" The case of Craig v. Missouri, 4 Peters, has been relied on as ruling this. We do not think that it does. They are distinguishable in at least one important and essential particular."

The appellants prosecuted this writ of error.

The case was argued by Mr. White and Mr. Southard, for the appellants; and by B. Hardin and Mr. Clay, for the appellees.

Mr. White for the plaintiffs in error.

The suit is brought on an instrument, alleged to be void, as the consideration given for it was a currency prohibited by the constitution of the United States. It was given for the notes of the Bank of the Commonwealth of Kentucky; and the question which is presented by the record, and which is now to be decided by this Court is, whether the law of the state of Kentucky establishing the bank, was not a violation of the provision in the constitution of the United

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

States, which prohibits the states of the United States from issuing "bills of credit."

The case is one of great importance, and the decision of this Court upon it, is looked for with deep solicitude. It was before the Court at a former term, and was then argued at large. The Court directed a re-argument.

The facts on which the plaintiffs in error rely, are fully established by the pleadings. The pleas in the court of Mercer county, state the nature of the institution established by the act of incorporation; and that it had no funds provided for the payment of the notes issued by it; and that the funds provided by the law were never paid to the bank. The plaintiffs demurred generally; and thus the facts stated in the pleas, are admitted.

The unconstitutionality of the law is stated in the pleas, and the court of appeals of Kentucky decided on the question thus presented; the case is then fully within the provisions of the 25th section of the judiciary act of 1789.

It will be proper to establish the jurisdiction of the case, before proceeding to the other matters involved in it.

The plaintiffs assert, that the charter of the bank is a violation of the constitution of the United States. It is the exercise of a claim by the state of Kentucky to establish a corporation; which, for the uses of the state, and for its exclusive benefit and profit, has the authority, by its charter, to issue bank notes, and to circulate them as money. This the plaintiffs in error asserted, in the court in which the suit was brought against them, and in the court of appeals, was issuing bills of credit by the state, and in direct conflict with the prohibition of the constitution.

The repugnancy of the charter, a law of the state, to the constitution, was alleged, and the decision was against the allegation. The courts of Kentucky, the plaintiffs in error say, misconstrued the constitution by the decision. The court of appeals expressly say, they are called upon to adjudicate on the constitutionality to the law; meaning, certainly, the constitutionality of the law, as it was alleged to be in opposition to the constitution of the United States.

All the decisions of this Court on the question of jurisdiction, sustain the right of the court to decide on the questions brought up by this writ of error. These decisions were carefully reviewed at the last term, in the case of Crowell v. Randal, 10 Peters; a reference to that case, is sufficient to sustain the jurisdiction now asserted.

[Briscoe v: The Bank of the Commonwealth of Kentucky.]

Upon the question, whether this Court has decided that a corporation, such as that which is the defendant in error, in this case, can have a constitutional existence, for the purposes for which it was enacted, has not been decided; it is submitted that no such decision has been made. The case of the Planter's Bank of Georgia, 9 Wheat. 304; 5 Cond. Rep. 794; contains no such decision. In that case, the state of Georgia had but a part of the stock of the bank; the bank had an actual capital, and was conducted for the benefit of the whole stockholders. This Court held, that a state might become a stockholder, with other stockholders in the institution; and that by so doing, the bank did not become exempt from suits, on the suggestion that the suit was against the state of Georgia. Nor did the decision of the case of Wister against the same defendants as in this case, determine that the Bank of the Commonwealth was a constitutional body, because the court sustained a suit against the bank. The charter provides that the bank may sue, and may be sued. The action of the court in that case, was in harmony with the law. If the state of Kentucky was, as she certainly was, and now is, the only party interested in the bank; yet a suit authorized by her own law could be brought against the bank. The bank has, by its charter, a right to take mortgages for debts due by it; and under a judgment against it, those mortgages might be made subject to an execution or a judgment obtained against the bank. The process of execution would not, and need not go against the state.

The question of the constitutionality of the bank, and of the right it had under the act establishing it to issue the bills, for which the note upon which this suit was given, is now first presented to the Court. While it is asserted that the decision of this Court, in the case of Craig v. The State of Missouri, 4 Peters, 439, will in all respects sustain the position taken by the plaintiffs in error, that the notes of the Commonwealth Bank are bills of credit; it is admitted that in that case, the bills of credit issued by the state of Missouri, were different from those issued by the defendants. The obligations of the state of Missouri bore interest; a circumstance to which great importance was assigned by Mr. Justice Thompson, who delivered a dissenting opinion in that case.

The Commonwealth Bank of Kentucky was established in 1820, during a period of great pecuniary distress; for which it was, by those who created it, expected to afford relief. While it was declared to be founded on funds provided for it, or assigned to it by the

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

state, none were delivered to it.   The act declared that certain lands might be paid for by the notes of the bank; it directed the property which the state held in another bank, then in great embarrassment, and which had suspended payment, should be paid to the bank of the commonwealth; but the bank of the commonwealth had no control over the land, and the property of the state in the old Bank of Kentucky, was never made available to the business of the new bank. Thus the bank had no funds, and all the officers were appointed by the state.  They were the agents of the state, to conduct the business of the bank, for the benefit of the state.   Its capital was, nominally, two millions of dollars; and notes purporting a promise to pay certain sums, were issued and put in circulation, in the form of loans; the state having the profit of the interest charged on the loans.   As no funds were in possession of the bank, these notes were taken on the faith and on the credit of the state; exclusively, and only.

The intervention of a corporation, by which the notes were issued, did not affect the character of the transaction.   If they had been put into circulation by a state officer, it would not be denied that the state issued them; but there is no substantial or valid difference between such a mode of managing the issues, and that adopted by chartering the bank.   The notes were in fact made a tender.   The law of Kentucky obliged the plaintiff in an execution, to receive them in satisfaction of his judgment, or to submit to a deferred result of his proceedings against his debtor.   The property of the defendant was to be taken at an appraisement, or it could not be sold for a considerable period, if the notes of the Bank of the Commonwealth were refused, when tendered in satisfaction of the debt.

Thus the notes of the Commonwealth Bank were in all respects the same, in substance, as they were in form, " bills of credit;" prohibited by the constitution of the United States.

The promise to pay, was the promise of the state of Kentucky, by its agent the president and cashier of the bank; the notes or bills were circulated as money, and they might also, in effect, be made a tender in some cases.   It is not essential that the notes should be a tender to make them bills of credit.   The Court are referred to the 44th number of the Federalist, for the views of Mr. Madison, as to the nature of the constitutional provision against the issue of bills of credit; and as to the construction of the provision in the constitution. Bills of credit and paper money are synonymous.   The abuse of paper money during the difficulties of the revolutionary war, and the

ruin which its extravagant issue produced, were the causes of the constitutional prohibition.

It is not intended to place the charters of banks, derived from state laws, having a capital furnished by the stockholders, or the notes of such banks, in question, in this case. They may rest in safety on other principles; and the practical construction, given by the states of the Union to the provision of the constitution which is under examination in this case, may put all questions of the validity of such charters at rest.

What is a bill of credit within the meaning of the constitution?

Our courts seem to have considered the interpretation of these terms a matter of some difficulty. "The term 'bill of credit' seldom occurs in the books," says judge Huger; in delivering the opinion of the constitutional court of South Carolina, in the case of James Billis v. The State, January term, 1822, 2 M'Cord, p. 15: and the learned judge adds: "but when used, it is always synonymous with letter of credit, and this appears to be its only technical signification."

In the case of Craig v. Missouri, 4 Peters, 442, the late distinguished and lamented associate of this Court, Mr. Justice Johnson, says: "The terms 'bills of credit' are in themselves vague and general, and at the present day almost dismissed from our language." In the same case, Mr. Justice Thompson says: "the precise meaning and interpretation of the terms 'bills of credit,' has no where been settled; or, if it has, it has not fallen within my knowledge." 4 Peters, 447. Mr. Justice M'Lean declares: "it will be found somewhat difficult to give a satisfactory definition of 'a bill of credit.'" p. 452.

It would be the height of presumption, in the face of such authorities, to say there is no difficulty; nevertheless, we may entertain a strong conviction that the terms have a clear and precise meaning.

It is evident that the meaning of the term used in our own constitution, is most naturally to be sought for, first, in our own history. Yet, on the arguments of the question heretofore, only two historical references have been made.

We propose to submit references from the history of each state; not merely to show what "bills of credit" were, but what evils resulted from them. The past mischief is an essential part of the interpretation of the future remedy. By learning what and whence

the country suffered, we shall learn what the convention intended to prevent.

Mr. White, submitting to the court a printed argument on the part of the plaintiffs, prepared by Mr. Wilde and himself, after the former arguments of the case; went into a particular examination of the proceedings of the different colonies, afterwards the states of the United States in relation to the issuing of bills of credit, or obligations for the payment of money, for the use of the several colonies and states: citing from the legislative acts, and from historical works, the provisions of the laws on the subject, and the actions of the governments of those states in reference to such measures. It was shown by these references, that Massachusetts, New Hampshire, Connecticut, New York, New Jersey, Pennsylvania, Virginia, North Carolina, South Carolina, and Georgia, had resorted to measures to supply a temporary, and sometimes a long continued currency, by issuing "bills of credit," "paper bills of credit," "paper bills, called bank bills."

Nor was the issuing of bills of credit, before the adoption of the constitution, confined to the issues of states: but the term was employed to designate the paper money emitted by congress. The resolutions of congress authorizing the different emissions, were cited from the journals of congress. The issues commenced on the 22d June, 1776, and they exceeded four hundred and fifty millions of dollars. They ceased to circulate as money, on the 31st May, 1781; although afterwards bought on speculation, at various prices, from four hundred dollars in paper for one dollar, in specie, up to one thousand for one.

On the 18th September, 1786, congress resolved that no payments of requisitions on the states should be received in bills of credit, or in any thing but specie. They also resolved that bills of credit should not be received for postage, and that postage should be paid on the letters when put into the office. 4 Vol. Journ. of Con. 698, 699.

The effects of this system of paper money were ruinous to the whole community. Specie was driven out of circulation, and all property was placed in confusion, and great deterioration in value. The common intercourse of business was suspended, or carried on with distrust and suspicion. Barter was introduced, and the impediments to all transactions of exchange, became almost insuperable.

It is contended, that bank bills and bills of credit are, in every important particular, substantially and essentially the same.

Mr. White then proceeded to examine the different colonial and state laws, for the emission of bills of credit; asking the Court, before the same was made, to note the material points of distinction supposed to exist between *bank bills* and bills of credit. He said they were,

1. Bank bills are not issued directly by the state. 2. They are not issued on the mere credit of the state. 3. A certain fund is pledged for their redemption. 4. They are not legal tender. 5. They are payable in specie.

The Court are to remark the character of the bills provided for by the different acts intended to be cited. In reference, especially, to those points of supposed distinction, it will be found,

1st. That the bills of credit were issued no more directly by the state, than the bills of the Commonwealth's Bank of Kentucky.

2d. That the bills of credit were very frequently not a legal tender.

3d. That the bills of credit were sometimes payable (nominally) in specie.

4th. That the bills of credit were rarely issued on the mere credit of the state.

5th. And that, almost always, a certain fund was pledged for their redemption.

If the Court, by this scrutiny, find such distinctions disappear; as no others have been taken, it will result that, essentially and substantially, the bills of the Commonwealth's Bank of Kentucky and bills of credit, are the same. And by making it in reference to each act as it is read, the trouble of instituting a comparison of each law on each point, afterwards, will be spared both to the Court and counsel.

Mr. White then cited the various acts of the several states, providing for the issuing of such "paper money," "obligations," "bills of credit," or "bank bills," and "notes," and "treasury notes."

If it be contended, then, he said, that the notes of the Commonwealth's Bank of Kentucky are not bills of credit, because they are not issued or emitted directly by a state, we answer:

1st. That in every instance the anti-revolutionary bills of credit were prepared, signed, and issued by a committee, commissioners, or trustees.

2d. That as a state can act only through her agents, it follows, that what she does through her agents she does herself.

3d. We avail ourselves of the forcible expressions of one of the

learned judges of the Court, in the case of Craig and others v. Missouri, (Mr. Justice Johnson,) who, though dissenting from the judgment of the Court in that case, on other points, was in our favour on this.

" The instrument (the constitution) is a dead letter, unless its effect be to invalidate every act done by the states in violation of the constitution of the United States.  And as the universal *modus operandi* by free states, must be through their legislature, it follows that the laws under which any act is done, importing a violation of the constitution, must be a dead letter.  The language of the constitution is, ' no state shall emit bills of credit;' and this, if it means any thing, must mean that no state shall pass a law which has for its object an emission of bills of credit.

" It follows, that when the officers of a state undertake to act upon such a law, they act without authority; and that the contracts entered into, direct or incidental, to such their illegal proceedings, are mere nullities."

"This leads to the main question: ' Was this an emission of bills of credit, in the sense of the constitution?'  And here the difficulty which presents itself, is to determine whether it was a loan, or an emission of paper money; or perhaps whether it was an emission of paper money, under the disguise of a loan."  " There cannot be a doubt that this latter view of the subject must always be examined; for that which it is not permitted to do directly cannot be legalized by any change of names or forms.  Acts done *in fraudem legis,* are acts 'in violation of law.' "  4 Peters, 441.

It cannot, we presume, be doubted, that the constitution was intended to prohibit all those paper substitutes for money, whatever were their particular forms or shades of difference, which had, before that time, gone by the general name of bills of credit.  It intended to make this a hard money government; perhaps entirely so; certainly as far as the states were concerned.  If, by omitting some, and inserting others of the forms, peculiarities, properties, or attributes of the different bills of credit issued before the adoption of the constitution, one could be formed dissimilar in many important particulars from any which had ever yet been issued; we humbly contend, notwithstanding such variation, it would still be a bill of credit, within the meaning of the constitution.  May we not ask, then, in what essential particular do the bills of the Commonwealth's Bank differ from the anti-revolutionary bills of credit?

The latter were issued or "emitted," to answer the purposes of money; a circulating medium, a measure of value, and an instrument of exchange. So were the former.

Do the bills of credit pledge a particular fund for their payment? So do the Commonwealth's Bank. The bills of credit were receivable in all debts due the public. So were the notes of the Commonwealth's Bank.

The bills of credit were sometimes, though not always, a legal tender. The bills of the Commonwealth's Bank were a qualified tender. If the plaintiff did not receive them, his execution was stayed.

The bills of credit were issued through the instrumentality of agents, for the benefit of the colony. The bills of the Bank of the Commonwealth were issued by agents, appointed by the state, for the benefit of the state.

Upon the term "emitted" there cannot, in this case, be raised a question.

With respect to a loan office certificate, which might, perhaps, be bona fide given upon an actual loan, as the authentic evidence of the creditors' right, and of the state's obligation; a question might be raised, whether such an instrument could be said to be "emitted," as a bill of credit is emitted, that is, to act as a substitute for, and perform the functions of money. But that the bills of the Commonwealth's Bank were so intended, does not admit of a doubt. It is so expressed in the preamble.

If it be contended, as by the constitutional court of South Carolina, that this is not a bill of credit, because a particular fund is pledged and set apart for the redemption of the bills, we answer:

1st. These funds are the revenues of the state; the pledge is the faith of the state. These resolve themselves at last into the credit of the state. Credit is given to her, because of her faith and revenue. If she break her faith, or squanders her revenue, she loses her credit.

2d. Almost all the anti-revolutionary bills of credit had funds pledged for their redemption. Lands or taxes were always set apart, as a sinking fund. Yet the bills of credit, so secured, were found as mischievous as the rest, and in the constitution there is no exception; the denunciation is general as to all bills of credit.

The other distinctions taken at different times are: That these are not to be considered bills of credit, because they are redeemable on

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

demand. The term of the credit cannot make a difference, whether it be a day, ten days, or a year. The promise to pay is the essence of the contract. It is the promise which obtains credit, and credit is given to the promise.

The bills of credit issued by many of the colonies before the revolution, were, in fact, payable on "demand." They admitted the debt to be due by the colony. The bill was to be as money, to the amount of its contents, and to be accepted in payment, &c. &c.

Vide forms of these bills in the Laws of Connecticut, 1709, 8 Anne, p. 145. Laws of Rhode Island, 1710, 9 Anne, p. 60. Laws of Massachusetts, 1702, 1 Anne, p. 171. Laws of Pennsylvania, 1709, 8 Anne, pp. 230, 231.

We have now shown that, substantially and essentially, bills of credit and bank bills are the same. We have shown that all the supposed distinctions are fallacious:

That bank bills are issued by agents of a state, and bills of credit were issued by agents of the states, which can never act but by agents; and the only difference is, that the agents are called by different names.

That the bills of credit were not always a legal tender; that they were not issued on the mere credit of the state; that they had almost always a fund to support them; and that they were frequently payable in specie.

The prohibition in the constitution was intended to secure the future against the evils of the past. The remedy was intended to be coextensive with the mischief. It was intended to reach not names merely, but things also.

The object was not merely to prohibit those particular kinds of paper currency, which had heretofore been issued or emitted by the colonies, or states; but every thing which, up to that time, had borne the name, or which should thereafter possess the character, assume the place, and be within the principle and mischief of bills of credit.

Still it is contended, the terms are not identical: it is said we have not shown that bank bills and bills of credits have ever been used as synonymous or convertible terms. We have shown that the things are not the same.

But it is insisted that the names are different. It will be snown then, that there is no difference even in name; that bank bills and bills of credit are, or at least were, once synonymous. The requisition is somewhat hard, but we will attempt it.

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

Bank bills are bills of credit. It is not necessary that on the face of the note it shall be called a bill of credit. In its form, it is a promissory note. The paper money before the adoption of the constitution, was not on its face called a bill of credit, it was in various terms, promises to pay money; but in all the legislative acts creating them, they are called bills of credit. It is demonstrated, therefore, that, in order to make a particular instrument a bill of credit, it need not be so denominated on its face.

But the bank bill is, in form, a promissory note. Where do you find promissory notes called "bills of credit?" Promissory notes and bills of exchange, or negotiable paper generally, as it appears from Malyne; were originally called bills of debt, or bills obligatory. They were called bills, though, from the form given, it is evident they were notes. They were denominated bills of debt, as being evidence of indebtedness.

But, subsequently, either because they were not always evidence of debt, but were generally on time, they came to be called bills of credit. They were also called bills obligatory; though it is apparent, from the form and context, that they were not sealed. Indeed, the seal belonged to the common law, rather than the law-merchant. Its use was for those who could not write; which merchants usually could do, though barons could not.

The constitutional court of South Carolina, then, are mistaken when they say "the term 'bill of credit' seldom occurs in the bonds, but when used, is always synonymous with letter of credit; and this appears to be its only technical signification." 2 M'Cord, 15.

Some old books do, indeed, give the form of a letter credit, which they call a bill of credit. Postlethwaite's Dict. tit. Bill of Credit, 4 Comyn's Dig. tit. Merchant, F. 3. But Malyne gives a similar form, and calls it, what it has always since been called—a letter of credit, not a bill; while the term "bill of credit" might, with the least industry, have been found by the constitutional court in a hundred places. M'Pherson's Annals of Commerce, vol. 3, p. 612, in the library of Congress. "This year, 1683, Dr. Hugh Chamberlain, a physician, and one Robert Murray, both great projectors, made a mighty stir with their scheme of a bank, for circulating bills of credit on merchandise to be pawned therein, and for lending money to the industrious poor, on pawns, at six per cent. interest; yet it came to nothing."

Mr. White referred to a number of authorities in mercantile trea-

tises, and historical, and other works; to show the origin of bills of credit. Many of these treated of bank bills, bills of exchange, promissory notes, bills obligatory, and instruments of that description, "as bills of credit." They were substituted for specie for convenience, and often to supply a deficiency of specie. Proceeding i the argument, he said:—

By this time, it appears to us, we have gone far towards showing that bank bills are not merely, substantially and essentially bills of credit; but that they are identically the same. Bills of credit is the old name for bank bills. The longer name has worn out of use, from a philosophical principle in language, which seeks conciseness, perpetually. Men of business never use three words, habitually, when the same thing can be expressed by two.

Our proofs, however, are not exhausted. Let us interrogate the banks themselves. What are their bills called in those charters, from whence they derive the right to issue them?

The 28th section of the first charter of the Bank of England, 5 and 6 William and Mary, ch. 20, sec. 28, speaks of the paper to be circulated by the bank, as "bills obligatory, or of credit." The charter of the Bank of Pennsylvania of 1793, uses the same terms. In the charter of "the New Jersey Manufacturing Company," granted in 1823, the terms "obligatory, or of credit," are used. In the charter of the Bank of Virginia, 2 Revised Code, 73, sec. 13, "bills obligatory, or of credit," are mentioned. So, also, the same terms are employed in charters of banks in North, and in South Carolina. The terms, "bills obligatory, or of credit," are employed in the charter of the Bank of Augusta, granted by Georgia; Prince's Dig. 32. So, also, in the charter of "the Planter's Bank," Prince's Dig. 39; and in that of "The State Bank," Prince's Dig. 43; the terms are used in reference to the paper issues of those institutions.

If it is contended that these terms refer to bills under the seal of the banks, and to letters of credit given by them; the answer is obvious. There are no other clauses in their charters which can be tortured into an authority to issue bills at all. If "bills obligatory and of credit" do not signify bank notes, the banks have been issuing notes without any authority whatever.

Judicial decisions have treated the notes for the payment of money as bills of credit; 2 M'Cord, 16, 17, 18; Craig v. The State of Missouri, 4 Peters, 425.

With respect to the third point of the appellees—that the bank

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

may be unconstitutional, and yet the appellants bound to pay their note:

The answer is obvious.   A contract made contrary to law is an act, in fraudem legis.   It is consequently void, and will never be enforced in the courts of that country whose laws are attempted to be evaded.   This principle is so well settled, as to be stored away among the established maxims of jurisprudence.

The case of Hannay and Eve, in 3 Cranch, 247, is as strong a one as can be well imagined.   Craig v. Missouri, only follows up that decision.   4 Peters, 425.

Mr. B. Hardin, for the defendants in error, stated, that he was present when the law was passed by the legislature of Kentucky; and although he did not approve of it, he was a witness to all that took place at the time of its enactment.

There had been large importations of goods into the United States, after the late war with Great Britain; and many persons in Kentucky had become embarrassed, by having made large purchases of those goods.   In this state of things, remedies and expedients were resorted to, which, like all quack medicines, failed in their effects; and left the disease where they found it, or in a worse condition.   It has been said, that the old colonial laws which provided for the issuing of a paper currency, were resorted to by those who drew the law establishing this bank.   This, most probably, was not the fact.   The framers of the law intended to provide for the issuing of paper by the bank; and they used language which would carry their object into effect.   They did not know of those laws; certainly the, did not resort to them.   The purpose of the legislature, in establishing the bank, was to give to it a substantial capital, competent to discharge all the liabilities it might assume; a capital as sufficient as could be provided for any institution for banking purposes.   By the ultimate redemption of all of the paper of the bank, the sufficiency of the capital was proved.   This is fully shown by the provisions of the seventeenth section of the law.   The lands of the state east of the Tennessee river, a large and a valuable body, which, by the agreed line between the state of Kentucky and Tennessee, amounted to about two millions of acres, and also other lands of great value, owned by the state; were made liable for the notes of the bank.   In money, these lands were worth from five to six millions of dollars.   All the interest the state had in the old Bank of Kentucky, was pledged, by

the law, for the redemption. of the obligations of the bank.   The
amount of paper allowed to be issued was not equal to that permit-
ted to other banks, in proportion to the security given for such
issues.   The objection to a want of capital of this bank is, therefore,
without foundation; for an equal capital, or property equal in amount
as a security for the operations of the institution, has not, in any in-
stance, been exceeded.

It is said the paper of the bank fell below par.   This is not in
the record; and if that fact should be allowed to have an influence,
other matters should be introduced.   The value of the notes was di-
minished by the conduct of the borrowers of the bank; who had
used them at par for their private purposes, and who had used them
for their full value.   No measures, which could bring the notes into
discredit, were attributable to the bank; and the amount of the paper
issued was constantly in progressive diminution, by its being destroy-
ed when paid in for taxes and for lands.   The laws of the state direct-
ed that the notes of the bank should be received for the public lands,
in the same manner, and as of the same value as the notes of other
banks, paying gold and silver.   The receivers of the proceeds of the
sales of the public lands south of the Tennessee, was directed to take
the notes of the bank for lands; Pamphlet Laws of Kentucky of
1824, sec. 8.   Under the operation of these provisions, there was
received for taxes, and for lands, by the bank, and by the old
State Bank of Kentucky, the notes of the Bank of the Common-
wealth, to the amount of nearly six hundred thousand dollars, which
were cancelled and burned.

In this manner, almost the whole of the issues of the bank have
been returned to it; and it is believed that before the suit now be-
fore the Court was brought, all the paper, with the exception of
about forty thousand dollars, had been returned to the bank.   Paper
of the bank, to the amount of about forty thousand dollars cannot
be found; and is supposed to be irretrievably lost.   Thus all the
notes, with the exception of those lost, have been redeemed.

By numerous successive acts, the legislature of Kentucky directed
that the notes of the bank, as they were redeemed, should be burned,
and this was done; cited Session Laws of Kentucky, of 1825, 1826,
1827, 1830, 1832.   After all the notes were thus satisfied, or
redeemed by other banks established under charters from the state;
the public lands, which had been pledged for them, were distributed
for school and road purposes.

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

The objections to the charter on the ground of there having been no capital provided for the bank, does not therefore exist; and the question which is alone presented for the consideration of the Court, is, whether the bank was constitutional, as the state of Kentucky was the only corporator. It differs from many other banks in this only; the state alone is the corporator, or stockholder. In many other banking institutions, states are joint stockholders, and corporators.

In the charter of the Bank of the Commonwealth, there is no pledge of the faith of the state for the notes issued by the institution. The capital only was liable; and the bank was suable, and could sue. The bank was sued; and in the case of Wister v. The Bank of the Commonwealth, 4 Peters, this Court held, that as against the corporation, the suit was well brought.

If it is unconstitutional for a state to be a corporator, how can she be a corporator for a part of the capital of the bank? If the state cannot alone be a corporator to issue paper, she cannot be in part such; and the constitution of the United States is violated, as well by the issue of notes for one dollar, as for one thousand; by the issue of notes, of which a state is one among many of the corporators bound to pay them, as well as if she had alone become bound for their payment.

What is the difference between the state being a corporator, or taking a bonus for establishing a bank; and authorizing the corporation so erected, to issue notes. The sale of a charter by a state, for a bonus, is the sale of the privilege to issue notes; which, if the state had not, she could not grant; she gives the bank thus established power to issue notes for her benefit; a benefit she has secured in advance, by the payment of the bonus to her.

It is submitted, that if the notes of the Bank of the Commonwealth are " bills of credit," and the issue of them was prohibited by the constitution of the United States, the notes of all state banks are equally prohibited. Before this question is approached, it is desirable to place it before the Court, on its true grounds.

The provisions of the constitution are:—" No state shall enter into any treaty, alliance, or confederation; grant letters of marque and reprisal; coin money; *emit bills of credit; make any thing but gold or silver coin a tender;* pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts; or grant any title of nobility;" art. I. sec. 10.

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

The powers granted to the government of the United States, of coining money, are exclusive; so are the powers to establish post offices, and post roads; and in addition to the grant of these powers, there are the express inhibitions to the states, which forbid their coining money, making tender laws, and issuing bills of credit.

It is claimed that making them a tender, is a portion of the character of a bill of credit, as the same was intended by the constitution. Each prohibition is separate. If the states could make any thing a tender but gold and silver coins, all would be confusion. What was meant by "a bill of credit," is not stated in the constitution, and is thus left undefined: we must look for the meaning of the terms elsewhere. We must look to the uses of the terms in past times; and on this search we find great difficulties, from their different application to different obligations for the payment of money, and the peculiar characteristics of those obligations when issued by states or political communities. We look to colonial legislation, and to the practices of states; and we are unable to ascertain from these, the true sources of information, with accuracy, what those who framed the constitution intended. Sometimes the bills issued under state or colonial authority were made a tender, and sometimes they were not. This is said by Mr. Chief Justice Marshall, in the case of Craig v. The State of Missouri. In the first issue of bills of credit by Massachusetts, they were not made a tender in payment of debts: afterwards, this character was expressly given to them. In South Carolina, they were made a tender; 2 Ramsay's Hist. of South Carolina, 164.

But there was a universal feature in all the bills of credit, issued before the formation and adoption of the constitution of the United States. The faith of the state, or of the government which issued them, was always pledged for their redemption. This was ever the fact.

Another feature and characteristic of these bills of credit was, that the state always issued them in its sovereign capacity, and no capital was pledged for their redemption. They were never issued by or in the name of a corporation. The bills of the Commonwealth's Bank were issued by a corporation, subjected to suits, and capable of suing.

This is the first time this Court has been called upon to fix the precise meaning of the words of the consitution under consideration; and they are now, by their decision, to save or take from the states a

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

little of their remaining sovereignty; and at the same time preserve and faithfully guard the constitutional rights of the Union. The Court, in exercising their powers, will do so as sound judges, and lawyers; and as sound statesmen and politicians. The plaintiffs in error ask, to impose restraints on the states, which will deprive them of powers essential to their prosperity, and to the business of their citizens.

In order to arrive at a true construction of the constitutional provision, it is proper to look at the mischiefs proposed to be remedied by its introduction into the instrument. These were the excessive issues of paper, and authorizing them to be made a tender. The great evil was making the bills a tender; without this, it was a voluntary act to accept and to refuse them; and no injury, but such as was freely consented to, could ensue. This should be the test of a bill of credit, as intended by the constitution. A state can borrow money; and give a note, or bond, or a certificate, transferable for the sum borrowed. The amount of the notes or bonds given for a loan made to the state, may be determined by her and the lenders; and they may circulate as the holders think proper. The form may be precisely the same as that of any other bank note, or bond, or evidence of debt; and she may pledge her faith and her property for the payment of such engagements. If notes or bonds given by a state are not made a tender, they will not be said to be bills of credit.

Another part of the case is deserving of the consideration of the Court. The notes given to the bank by her debtors, and by the law authorizing them to be taken, are made payable absolutely. Suppose the bank to be unconstitutional, yet the notes given by individuals, and held by the bank, must be paid. They were given for value, by those who gave them; and they used, for the purpose of purchasing lands, the notes received by them from the bank. This was a valuable consideration for the contract, and imposes an obligation to pay the notes independently of any other matter. Whatever is a benefit to one, or an injury to another, is a consideration.

This Court has no jurisdiction of the case under the 25th section of the judiciary act. The question of the consideration given by the bank for the notes, and the question of the constitutionality of the law, were both before the court of appeals. That court could have given the judgment, which was given, without deciding the constitutional question. The construction of the constitution of the United States was not necessarily involved in the judgment given in this

cause. This is an essential feature in every case brought here under the judiciary act of 1789.

Mr. Clay, also of counsel for the defendants in error, said, he was gratified by the learning and research of the counsel for the plaintiffs. He had gone into an investigation of commercial, historical and statutary authorities, which were highly interesting; but were not considered, by him, essential to the decision of the case before this Court.

He had, when the bank was established, concurred with many others, who were, with him, citizens of the state of Kentucky, in the opinion that it was impolitic and inexpedient; and its inexpediency is now generally admitted. But among those who promoted the establishment of the institution, none went further than some of those who now come before this Court to ask to be relieved from the obligations they entered into with it; and for which they received, and used the notes of the bank. Those notes have all been redeemed; they fully answered the purpose of those who borrowed them. They were of value to them; they solicited them from the bank, and voluntarily received them. It is doubted if the cause of morals would be most promoted, by allowing a release from their contracts, of those who are before the Court; or by sustaining the bank, even if it is unconstitutional.

The old Bank of Kentucky had a capital of one million of dollars; and one half of which was reserved by the state, which the state afterwards paid for. Besides this property of the state, lands were pledged, and taxes were payable in the notes of the Bank of the Commonwealth. Loans on mortgage of real estate were authorized; and these mortgages became a substitute for real property, and could be made liable for the debts of the bank. The bank had also extraordinary powers for the collection of debts due to it. Thus, full provision was made for the preservation of the solvency of the institution.

The depreciation of the paper of the bank was gradual, and afterwards became very great. But it is proper to state, that the credit of the paper afterwards rose, and became equal to par; and in credit, as good as that of the notes of any other monied institution. So it continues. The depression of the value of the notes of the Bank of the Commonwealth, was similar to that of all other banks which suspended specie payments. It was not greater than the notes of other banks, in similar circumstances.

Two questions are presented in this case.

1st. Were the notes issued by the state of Kentucky?

2d. If so issued, are they bills of credit within the meaning of the constitution of the United States?

The plaintiffs in error must establish both of these propositions: if they do not sustain both, they will fail in their application to the power of this Court. The constitution requires both properties to be features in the note, which formed the consideration of the obligation upon which the suit was brought, against the plaintiffs in error.

1st. The state of Kentucky did not issue these notes, they were issued by a corporation.

This point has been already decided in the case of Wister, 2 Peters, 318. The defence set up in that suit was, that the bank and the state of Kentucky were the same, and that the state was alone the defendant in the suit. That being so, the suit could not be maintained, and the Court had no jurisdiction. The very question in the case was the identity of the bank and the state; and whether the emissions of notes were by the state or by the bank. This is expressly declared by Mr. Justice Johnson, in the opinion of the Court.

It is not important, in considering this case, to inquire what portion of the sovereign power of the state was given to the bank by the appointment by the state of the officers who conducted it. The number of the officers was of no consequence. If the argument of the plaintiffs in error is good as to the delegation of all the power, it is good as to part; as if the state is represented by the officers of the bank in any extent, it will be sufficient; so far as this point is under consideration, to make the state the actor in the operations of the institution. The defendants in error must show, and they can do so, that the issues of the bank were not those of the state. It is contended that the whole of the operations of the bank were those of a corporation, acting under the law of its creation; and managing funds provided and set apart by distinct and positive appropriations, for the security of its operations; in which the state was not acting or interfering.

It is said by the plaintiffs in error, that the issues of the notes by a corporation created by a state, is but an indirect action by the state, of that, which the constitution of the United States prohibits to be done, directly. This is not admitted. If the position assumed is true, all banks incorporated by states are obnoxious to the same censure, for all derive their powers under state laws; and if the

rule asserted can be stretched to include the Bank of the Commonwealth, it will take in all banks; it will operate to the same extent on all. The argument of the counsel for the plaintiffs in error goes to show that all state banks are unconstitutional.

But you cannot stop at state banks. Other obligations for the payment of money form a part of the circulating medium. Are not bills of exchange authorized by state laws, and their payment enforced by state laws? They are thus brought into circulation, and they form a part of the currency of the community. So the notes of a private individual owe their credit to the laws of the state in which they are issued, as those laws compel their payment by the drawer. Thus these issues are founded on state laws. The argument then goes too far. It should stop at the plain intention of the constitution; and at the object it proposed to accomplish.

What are the principles and the rules which should govern the Court in this case?

This Court, in the Georgia case, say, that only such a violation of the constitution as is plain and palpable, should call into action its powers under the provisions of the instrument. The language of the constitution is that which is in common use, wel' understood by the community, and known to those upon whom it `as intended to operate; nor should the aid of foreign laws or usages be called on for its interpretation. This is not necessa', y, and would involve the proper understanding of it, in difficulty a.d in doubt. The constitution is to be construed with a view to these principles. The proper and certain interpretation will be adopted, whatever will be the consequences. Courts have sustained an interpretation of laws which had been given to them, although they have regretted their obligation to do so. Will not this Court limit the constitution to its plain meaning, and its evident interpretation? If viewing its provisions by these rules, defects are found in it, the Court has no power to remedy them; but ample powers for the purpose are provided in it.

The application of the rules which are applied to the construction of statutes, is protested against. The constitution is not to be interpreted by such rules; and the framers of the instrument, and the people when they adopted it, did not intend to subject it to the exercise of the same powers of interpretation; which courts properly exercise over legislative enactments.

The constitution prohibits the issuing bills of credit, by states, and

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

this does not apply to corporations; or to any other issuing but by the sovereign action of a *state*. This is the clear and plain language of the constitution; and confined to the action of a state, there is no difficulty.

In the case of Craig v. The State of Missouri, the issues were by the state, by its officers specially and expressly authorized and commanded to issue the paper. Whatever doubts were entertained upon the question whether the issues were bills of credit, none existed, that the paper was that of the state. No person responsible or suable was put forth when the obligations were given.

The counsel for the plaintiffs has failed to show that the notes of the Bank of the Commonwealth were issued by the state of Kentucky.

The notes were the notes of a corporation. The name of the state is not mentioned in them. The corporation only binds itself for their payment; the funds of the corporation were only answerable for the redemption of this pledge. How, then, can it be said they were issued by the state, and that they were bills of credit of the state? Nothing appears in their language, nothing in the emission of them, to sanction such an assertion.

If a state owns the whole or a part of the capital of a bank, she may be a corporator. It cannot be said that she may be a corporator for part of the capital stock, and cannot be for the whole. On what principle can this limitation be established, and how shall it be ascertained? A bank may be constitutional, and its operations legal until a state shall take an interest in its capital; and its unconstitutionality will begin and be complete when a state shall assume the full ownership, by a fair purchase of the stock of its whole capital. Such a change of character cannot be sanctioned; it can never take place. The fact that a state may own a part of the capital of a bank, as was held by this Court in the case of the Planters' Bank of Georgia; that a state may become a corporator in a bank; is decisive of the right of a state to make herself a sole corporator. The decision of this Court in the case last referred to, and in the case of Wister, cited from 2 Peters, has closed all doubt upon this point.

Are the notes of the Commonwealth's Bank bills of credit?

The argument and the authorities relied upon by the counsel for the plaintiffs in error, have been listened to with profound and anxious attention, for the purpose of finding a definition of a bill of credit. This has been done without success.

The definition which is submitted to the Court, on the part of the defendants in error, which, if any can be given, seems to approach nearer to the meaning of the constitution than any other which has been offered, is, that it is a bill resting on credit alone, with no other basis to support it. The forms of bills of credit have varied; but the faith of the state was always pledged for their redemption or payment.

The convention which formed the constitution of the United States had the evils of the paper currency, issued during the revolutionary contest, before it; and the provision was introduced in reference to those evils, and to the state of things which they produced. Under these views they intended, by a bill issued on credit, one for the payment of which there is no adequate provision; resting on public faith for its redemption. But if we cannot get a definition, we can look at what were the properties of the paper currency of the revolution, and see if they were the same as the notes of the Commonwealth's Bank of Kentucky.

1. That currency was issued by and in the name of the states, individually, or by congress.

2. It performed the office of money, or of a circulating medium.

3. There existed no compulsory power to enforce its payment.

4. There was no adequate provision for its redemption; and, in fact, it was not redeemed.

All the mischiefs of a paper currency are prevented that can exist, if the payment of it in gold or silver may be enforced; and nothing of this kind existed in reference to the revolutionary bills of credit.

- If the notes of the Commonwealth's Bank were of this description, the defence will be abandoned. They were money, and they performed the offices of money. They were subjected to the power to compel their payment by an appeal to the tribunals of the state; and, as was done in Wister's case, by a successful appeal to the courts of the United States.

The paper issued by the bank is described in the seventeenth section of the act of the assembly. It was expressly declared that all the notes should be redeemable in gold and silver. In the first section of the act, the bank is declared to be a corporation capable of suing, and of being sued, and of being compelled to pay their notes, undeniably, in gold or silver. In every instance of the revolutionary and anti-revolutionary paper, there was an inadequacy of

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

funds. These statements show, individually, that there was no co-incidence between the notes of the bank, or the bills of credit of the revolution; except, only, that both performed the office of money.

These are bank notes redeemable, and redeemed by specie, and payable on demand and they are not bills of credit. Such notes as these were, are the representatives and evidence of specie; and such a note is like a check for the payment of money. But bank notes were not the paper of the revolution; and the words of the constitution do not comprehend them. It is then clearly established that those notes were not bills of credit, and were not affected by the constitutional prohibition.

It is not true that the states which issued the bills of credit before the adoption of the constitution, could be sued for those bills. The citizens of other states could institute suits, but not their own citizens; and thus the limited liability of those states is not a feature like that which existed in the notes of the Commonwealth's Bank. The larger portion of all the bills of a state would be held by its own citizens, and as to that portion no liability to suit existed.

The Commonwealth's Bank of Kentucky is, like the banks of other states, created for the benefit of the state and its citizens; and having provision made for the full payment of its obligations, and subjected to suits; and all its bills and notes have been redeemed. Although when other banks suspended specie payments, their notes were, temporarily, bills of credit; yet the liability of the bank to suits for the sums due by them, gave them a distinct character.

The day will be disastrous to the country when this Court shall throw itself on the ocean of uncertainty, and adopt an interpretation of the prohibition of the constitution which will apply to a constructive bill of credit. The large and prosperous commercial operations of our country are carried on by bills of exchange, notes, and bank notes, redeemable in specie, and on which suits may be brought: should they not be paid according to their tenor. The credit of all such bills may be brought into question, should the Court decide this case against the defendants. Keep to the plain meaning of the terms of the constitution, and do not seek, by construction, to include in its prohibitions such paper as that which is brought into question in this case, and all will be safe.

Mr. Southard for the plaintiffs in error.

There are two questions, which it is not proposed to discuss.

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

They are, 1. Has the Court jurisdiction of the case? The plea, in words, denies the constitutionality of the law of Kentucky, creating the bank. The jurisdiction of the Court is therefore apparent upon the record, and the case in 10 Peters, 368, carefully and clearly reviews all the decisions on this point.

2. If the law be unconstitutional, is the contract void? It is understood that the opinion of the Court in Craig v. Missouri, was nearly unanimous, in affirming illegality of such a contract.

I cannot persuade myself that it is proper, for me, to attempt to sustain by argument, what this Court has so recently decided. To suppose that it will alter its opinion, from year to year, or change its decisions upon such questions, when there happens to be a change of its members, would not be respectful to such a tribunal; but it would, if it were true, justify the application to our country, of the truth, *misera est servitus, ubi lex aut vaga aut incognita est.*

Nor shall I postpone my argument to combat the allegations of fraud and wrong against my clients. Such charges are easily thrown out, and are not unfrequently used to aid in legal discussions, although very inappropriate to such discussions. They cannot, here, be met by evidence and explanations; cannot be persuasive and controlling upon the judgment of this Court; and are no more applicable, in this case, than in all others, where a defendant has received money, and, for just cause, refuses to refund it. They might easily be retorted on the adverse party, but I do not feel the necessity of doing it. There is enough in the constitution and laws to justify my clients in claiming the judgment of the Court, and to them I apply my observations.

I am to maintain that the law of the state, entitled "an act to establish the Bank of the Commonwealth of Kentucky," approved 29th November, 1820, was a violation of the constitution of the United States; and its bills were bills of credit within the prohibion of the constitution. There are two provisions in the constitution which are connected with, and control this subject. The one gives power to congress; the other restrains the power of the states. Art. 1, sec. 8, item 5; "Congress shall have power, &c. to coin money, regulate the value thereof, and of foreign coins; and fix the standard of weights and measures: and item 6, adds, "to provide for the punishment of counterfeiting the securities and current coin of the United States." This gives the power to the Union.

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

The 10th section of same article declares, that no state shall enter into any treaty, alliance or confederation; grant letters of marque and reprisal; coin money; emit bills of credit; make any thing but gold and silver coin a tender in payment of debts; pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts; or grant any title of nobility. This restrains the authority of the states.

The phraseology and form of expression in these items of the constitution deserve attention. They are similar, both in the grants of power to one portion of our government, that of the Union; and the restrictions upon the other, that of the states. And as the phraseology and form of expression are the same, the construction must correspond. Each power and each restraint is separate and distinct from the others; although they were combined in the same sentence, simply, because they were of the same nature and character.

Thus, "congress may coin money;" this is one power substantive and different from the rest. "May regulate the value thereof, and of foreign coins," is another power; "may fix the standard of weights and measures," is still another. Each may be exercised without the rest. Congress may coin money, without regulating the value of foreign coins, or fixing the standard of weights and measures. So it may do either one or both of the two latter, without the former. They are, and were intended to be separate acts of the government; one or all of which might be performed at such times and under such conditions, as the discretion of those who administered it should select. The nature of the acts and the form of expression, both require this understanding and construction of the instrument.

The same remark applies to the restrictions upon the states, in the 10th section. Taking the part of it which is directly involved in this discussion, we see that they may "not coin money." That is one power, which as-independent states, they possessed before their union; but which is now denied to them. They may not "emit bills of credit." That is another power, antecedently possessed and exercised by them, which is now forbidden. They may not "make any thing but gold and silver coin a tender in payment of debts." That is a third power, frequently practised, but now prohibited.

These powers, though of the same general character, and affecting

the same interests, were separately used by the states. They might coin money, without emitting bills of credit, or making any thing but specie a legal tender. They might, and did emit bills of credit, without coining money or creating a legal tender. They might, if they had so chosen, have created a legal tender without coining money, or issuing bills of credit. The acts were distinct in their nature, and separately performed; but two, or all of them, might have been performed at the same time, and by the same act of legislation.

The framers of the constitution, thus regarding them, united them in one sentence; but clearly restrained each of them, whether combined or disunited, in the action of the states; and they framed their prohibition in the same mode and form as they granted the correlative powers to the general government.

In construing the instrument, therefore, we must apply the same principles to both clauses. We must keep the acts separate; and the rules which we apply to the grants, we must apply also to the restrictions. If, in the authority to coin money and regulate the value of coins, we find full and exclusive control on the subject given to congress; we must also find in the restrictions, complete restraint from the exercise on the part of the states. The propriety of this might be enforced, and be illustrated, by various examples in the constitution itself.

To coin money, then, is one power; to emit bills, a second; to make a tender, a third: in their nature, and in the language of the constitution, distinct and independent of each other. And the restrictions upon the states apply to each as a separate act, or exercise of power.

The Court will perceive my object. The powers to emit bills of credit, and to make a tender, have been treated, in argument, as if they were one and the same thing; and it has been urged that the emission of bills of credit which was forbidden, was that emission only which was connected with, and received its character from the fact that the bills were made a tender; and that unless they were made a tender, their emission was not forbidden. There is nothing in the words and phraseology of the constitution, nor in the nature of the acts to justify or sustain the argument. A state may violate one or both of these restraints, and its legislation will be void, because unconstitutional. It may issue bills, and yet not require that they shall be received in payment of debts. It may not issue bills, and yet may require something like specie to be received, by its

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

citizens, in discharge of debts. Both would be improper, and equally so.

In practice, the two acts have not been the same. Previous to the revolution, all the states issued bills of credit. In a proportion of the cases, they were not made a tender. A reference to the books, on this point, has been made, and need not be repeated. This Court, in 4 Peters, 435, stated the fact with historical accuracy. The general government has also issued bills without making them a tender. The treasury notes of the war of 1812, were bills of credit, but they were not a tender. The government had authority to issue them; its necessities justified their emission. But it did not require that they should be received by the people of the United States in payment of debts. Will it be seriously debated that they were not, therefore, bills of credit; and that, if the states had issued them, they would have been constitutional?

The plea in the case before the Court, puts in issue the constitutionality of the whole law; and, if it be found to violate either of the prohibitions, it must be declared void. It could not authorize the issuing of bills of credit by the state; nor could it make either the bills issued, or any thing else, but specie, a legal tender.

That the view presented is in conformity with the opinions of those who best understood the constitution in its early days, I refer to the Federalist, 193; the number written by Mr. Madison.

If a different opinion is conveyed in his letter to Mr. Ingersoll, which I do not admit, it can only be regretted; and we must appeal from the inattentive commentator, to the constitutional lawyer, sitting in judgment when every faculty is awake.

I refer also to Craig v. Missouri, 4 Peters, 434, where the Chief Justice, for the Court, draws the clear distinction; and the dissenting judges do not deny it.

I might, then, consider myself as already relieved from one difficulty which has been interposed in this cause. But I venture to urge a further consideration. The separation of all these powers of coining; issuing bills; making legal tenders; fixing standards; and the bestowal of them on the Union, to the total exclusion of the states; was indispensably necessary to accomplish the great ends for which the constitution was formed. Its leading object was to make the people, one people, for many purposes; and especially as to the currency. One; so far as the high immunities and privileges of free citizens are concerned. One; in the rights of holding, purchasing,

and transferring property. One; in the privilege of changing domicil and residence at pleasure. One; in the modes and means of transacting business and commerce. It intended to break down the divisions between the states; so far, if you please, and so far only, as to remove all obstacles to intercourse and dealing between their respective citizens.

To do this, one currency was necessary. The dollar and the eagle of Georgia, must be the dollar and the eagle of Maine. That which would purchase property or pay a debt in Virginia, must purchase property or pay a debt in Massachusetts.

Hence the power of creating and regulating the currency was given to the Union, and withdrawn from the states. One power, the common will of the whole, is to decide what that currency shall be. Congress shall coin money—the states shall not. Congress shall regulate the value of coins, domestic and foreign—the states shall not. The authority is fully and absolutely given to the Union, without restriction or limitation. The states can do nothing which shall interfere with the establishment of a uniform, common currency, and with a uniform standard of value—a standard which every citizen is to have, no matter where he resides, or with whom he deals; which the resident of each state shall employ in his transactions with those of every other state.

This transfer of power to the united body was indispensable. Before the revolution there was no common currency, or standard of value; except as the colonies were subject to those of the mother country. During the confederation there was none; none established and regulated by competent authority. Each state, with an unrestricted will, made one for itself. To do this was one of the attributes which they assumed, when they declared themselves independent. It is, indeed, a natural, inalienable, indispensable attribute of sovereignty, in all nations, civilized and savage. How the states exercised it, during the confederation, in the first moments of their national existence, is matter of interesting but not of necessary inquiry in this stage of the argument. But when they passed from confederation to union, their right, in this respect, necessarily ceased. A confederation might, an union could not exist with the power exercised according to the will or caprice of the different members. The confederacies of Greece, Holland, Switzerland, Germany, and others, had existed with such exercise. The Union required one currency to place all its citizens on the same platform—to obviate innumera-

ble causes of dissatisfaction and dislike—to give to the common government the authority which was absolutely indispensable to enable it to accomplish the great and benevolent purposes for which it was created.

Hence the power conferred upon it is *exclusive.* To reason safely, we must keep this in view; and as the *restrictions* upon the states, are meant as the *guards* of that power, we must so construe them as not to permit them to encroach upon or interfere with the power. The power and the guards must stand together, and may not destroy each other.

What then is the power to create and regulate a currency for the Union? It is to establish by law, *that* which *all* shall receive, as money; which shall pass, at a fixed value, in all the transactions of society, and having the national sanction, that nothing created by others, shall interfere to defeat it. It is to make a legal tender. To establish the material and the standard by which all contracts shall be governed; which do not themselves provide otherwise by agreement between the parties. To prescribe what the debtor may be compelled to pay in satisfaction of his debt, and what the creditor shall receive from him.

Such a currency was altogether proper and indispensable under a system, which for the first time, in the history of free governments, established it as a fundamental principle that " the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." It was impossible to carry out this principle without it.

Congress, in 1789, immediately after the government commenced, passed a law in relation to certain foreign coins; and by a long ..ain of acts, familiar to the Court, and ending in 1834; from time to time regulated them, as convenience, discretion, and the condition of our own coinage required. In 1792, they established a mint, and cautiously prescribed the coins which should be made, the standard by which they were governed, and the value at which the citizens of the Union should receive them.

This law *created* a currency for the Union. It has been called *constitutional currency.* It is constitutional, because the law creating it was authorized by the constitution; but it is not so in that sense alone. The constitution authorized congress to create a *legal currency,* and this is its proper designation—legal currency, or money current by law. Congress might have created a legal cur-

rency not of gold and silver. They issued treasury notes, and chartered a bank. They had the power to make the treasury and bank notes a legal currency, a-lawful tender, because the power is without restriction in the constitution. But it would have been most injudicious and inexpedient; an exercise of discretion, unjustifiable then, and which will not and ought not to be exhibited hereafter. Power and duty are not always the same. Policy and power are often opposed.

The Court will remark, that I do not labour to define, but I desire to distinguish between currency and money, or circulating medium. Legal currency is what the government by rightful authority declares shall pass at a fixed value, in the transactions of society, as gold and silver here; money or circulating medium is that which passes by consent and agreement, or otherwise, in contracts and business transactions. It may be gold and silver, or bills of credit, or even promissory notes, which are received as discharges of debts. The former in all countries is small in amount, in ours not more than from seventy-five to eighty millions; the latter, if all kinds are embraced, reach probably to nearly one thousand millions. The former is the standard and regulator of the latter. The former is entirely under the disposal of the general government; and it was the avowed purpose of the constitution to prevent the states from interfering with it. The latter is not prohibited to them. But it was that they might not touch the former, or do that which should destroy it, that the prohibition of bills of credit was inserted. They were money currency, if they had the credit and faith of the state stamped upon them; and their circulation would interfere, injuriously, with the common intercourse and obligations of the various parts of the Union with each other.

Among the circulating medium are to be found, the common bank bills, issued by corporations, as state banks, and promissory notes issued by individuals; as by Morris and Nicholson, of former times; and the Nashville firm, and others of more recent date. They are not legal currency. No man is compelled to receive them for debts due, or on contracts. No man's right to refuse them can be questioned. No law requires them to pass current; it is matter of convention.

They are bills of credit of individuals or corporations, and are received on the faith and credit of those who issue, and at the hazard of those who receive them. They form, by assent of parties, a substitute for current money; but have no legal validity as such. Indi-

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

viduals and corporations may issue them; and those with whom they deal may receive them without violation of the constitution and laws, unless they are forbidden to do so. But it is precisely such which the Union intended to prevent the separate states from emitting, on their own faith and credit. And for most obvious reasons, as will presently be further seen.

It is not my purpose to contest the constitutionality of the bills issued by individuals, or by banking incorporations, who have authority by their charters to issue them. I do not concur in the printed argument which has been handed to the Court, so far as it seems to declare that all these state banks are unconstitutional; nor is it necessary for my argument, or my cause, that I should agree to that position. The states have power to create corporations; to invest them with the right to issue promissory notes on such terms, and with such security as shall seem proper; to place them in this respect on the footing of individuals. But the states have not the power to make the notes issued by them current money, or compel their citizens to receive them. This would be an assumption of the authority which has been solemnly vested in the Union alone.

The duty of congress is to create and to protect a common currency of the Union. The power to create, embraces the power to regulate, and the means of regulation. The means and the character of this regulation, need not be explained at this stage of the argument. But it will be found, that the admission of the right of the states to create banks, will afford an argument in denial of the right of the states themselves to issue paper on their own credit.

Why should these notes be received and used as a part of the circulating medium? Solely from the unavoidable scarcity of current money? The country requires more circulation, than specie can possibly afford. They are necessary for the business of society. The same apology existed for treasury notes, and notes of a bank of the United States. Bills of credit, at all times, have this justification, no other; and they may be received, but must not be legalized as currency by the general government. No public agent of the Union, no representative ought to recognise them as currency by any act of legislation.

I urge, then, that congress has the entire control of the currency, and with it, as a necessary consequence; the power to regulate the circulating medium; and that, until there is an absolute restriction by competent authority, ordinary bank bills are a tolerated, legal,

*[Briscoe v. The Bank of the Commonwealth of Kentucky.]*

and constitutional part of the circulating medium; but no part of the legal currency.

This view of the constitution can, by no possibility, create difficulty, or trespass on the rights of the states. The rule as to them is, that they cannot issue bills which shall rest on their own funds and credit, and circulate as money by governmental authority. There is no necessity for them to do it; all the duties which remain to them as governments, can readily be performed without it. The great causes which have always created, and in all countries, the necessity for this exertion of power, have been removed from their action. Those causes had connexion with, and sprung from the intercourse, peaceful or hostile, with other nations; almost universally from war. The bank of England was created to enable that nation to carry on a war with its great rival. Massachusetts, Connecticut, New York, and New Jersey, issued their first bills to obtain aid in the struggle in Canada. South Carolina raised by that process the means to carry on her war against the Indians; and both the state and confederate bills were issued to sustain the war of independence. But all foreign intercourse is taken away from the states; they wage no foreign or Indian wars: they need not therefore the power, in case of such difficulties, to resort to this expedient.

While in war it is unnecessary, in peace it would produce disastrous consequences. If they were to issue such bills, they would draw a direct distinction between their own citizens and those of other states: and if they were rejected or discredited by other states, or by the Union, distrust and dissatisfaction would ensue, and the Union itself be weakened and endangered.

Bank bills, or promises to pay, by incorporations or individuals, depend for their circulation on the faith reposed in, or, in other words, on the credit of those who issue them. And it matters not whether the promise to pay is on demand, or at a future day, or at the discretion or convenience of the payee. The time of payment has nothing to do with their character as bills of credit. A bill to pay when presented, is no more a bill of credit, than if it fixes a day when it is to be paid, as a year or six months hence. It still rests on the credit of the maker. This is so, even if a fund is mentioned by which it may be secured or protected. In private cases funds are seldom specified. In public, almost always. It was so generally, though not universally in the bills of credit of the states; before and during the revolution. But whether with or without a

fund, the credit is and must be given to the individual or party who makes the promise; and who, by that promise, binds himself to satisfy the holder for the amount. In this respect there is no difference between the makers; whether private citizens, corporations, or states. We look to the person who is bound to see the bill paid; and it is his bill of credit. It is not the agent who may sign; it is not the substitute, but the principal. And if he be found, the bill is the credit; the trust is his, and upon him.

Banks generally issue bills payable on demand; they often issue notes, post notes, payable at a future day, sometimes bearing interest, and sometimes not. Yet they are still their notes; their bills of credit; they are circulating medium. So the government issued treasury notes, payable at a future day, and bearing interest. They were the bills of credit of the government; and their circulation, as a medium, depended on the credit of the government. So, also, if a state by its agents issue bills, for which the agent is not individually responsible, but which must be paid out of funds provided by the states; it is not the bill of the agent, but of the state. The form is nothing; who is to pay, and out of whose funds is the payment to be made, is the decisive matter.

Now, if a state by its agents or otherwise, issue bills which pass as money, they pass, not on the credit of the agent, but of the state itself. If that credit is disgraced and rejected, it is not the agent who feels and suffers, but the state. If the bills are refused by other states, or impeded by the general government, the state is affected. Her separate sovereignty is impeached. Imputation is cast, by her equals, and by the Union, on her credit and solvency. Hence, will instantly arise a train of evils to a Union like ours, which will strike the mind without the aid of description or argument. The constitution designed to prevent such results. This Court will not counteract that design. But this is not all. These bills are the money of the citizens of the state. If other citizens of the Union reject it, private conflict immediately arises. And this strange exhibition is made in a Union among one people, that a part have one currency, another part another. And the citizens of the state which emits have two governments, one of which they may pay in one medium, and the other they must satisfy in a different medium; the cities of other states are compelled to avoid all dealing with them, or receive what is not current where they reside. This train of reflection deserves consideration, when the meaning of the constitution is sought.

Those who made it, were not blind to such effects. The great principle is, that the Union has the power over the common currency. The states cannot interfere, and, upon their faith, credit, sovereignty, establish any thing which is to have that character. They may authorize their citizens to issue bills, but they may not give those bills any portion of their power or authority, or credit. The moment they do this, they become invested with a new character; they become public money; national so far as a state is national; separate so far as a state has separate and independent existence. They create a currency of their own, different from that which is currency elsewhere.

It has been supposed that this grant of power to the general government arose from the evils which the states had inflicted on themselves by paper money, and was intended to guard them from a repetition of these evils. These were great and appalling; their history is one of imposition and oppression; and they doubtless led the states to a willingness to surrender the power: but it was not so much to create a guardianship over the states, and prevent state and local, as confederate difficulties, that the provision was inserted in the constitution.

The remedy for pre-existing and for prevention of future evils was the power conferred on congress. And that power was sufficient for its object, if it had been wisely exercised. But this is not the place to point out and secure its proper management. Difficulties and inconveniences in the formation and administration of laws, are not for this tribunal.

The positions resulting from the preceding suggestions appear to be,

1. Congress alone can establish and regulate the currency.

2. States may create corporations which, like individual citizens, may issue bills of credit.

3. These may be received or rejected, at will, by the citizen.

4. Congress may determine how far they shall be treated as currency—as a tender.

5. In doing this, they must make the currency uniform.

If these principles have been explained, we may inquire further into the guards which are provided to prevent their violation.

They are two; the states, in virtue of their funds, credit and sovereignty, are not to emit bills, nor make a tender of any thing but gold and silver

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

Both these had been done by the colonies and by the states, in innumerable instances; some producing incalculable evils, others rather beneficial than injurious. In New Jersey, for example, her bills had been so regulated and secured, although they amounted to, nearly, if not quite two millions of dollars, that their credit and payment were protected; and the evils felt by her people, were rather from the paper money of the confederacy, than from her own: and this may in part account for her vote on some questions relating to this provision of the constitution. 4 Elliot, Debates, 137.

The prohibition is in the most absolute terms. "No state shall emit bills of credit." It did not so stand in the draft of the constitution reported by the committee. There, it was conditional. "No state, without the consent of the legislature of the United States, shall emit bills of credit." 4 Elliot, Debates, 123. The condition was expunged. The prohibition is peremptory. It is so also as to coining money and making a tender; the other two acts which might interfere with the general powers granted to congress. And it is apparent, that one of them is no more taken away than the others. The states have the same right to coin money, as to emit bills.

These bills and paper money were one and the same thing. The paper money of the colonies and of the new states were called bills of credit; simply because issued by the authority of the states, created by them, and which they were bound to redeem.

This requires no argument or reference to authority, because it is admitted fully by the adverse counsel, and is not denied. The paper money were the bills of credit, and there was no other. Now if all bills of credit are forbidden, then all paper money is forbidden. If there be any exception, it is to be shown by those who maintain the validity of the state issues.

Whatever the states were in the habit of issuing is then prohibited. What were they? I shall not refer to the multitude of acts which have been cited, and to which the Court have references. They were all of one character; having one object, and one substance. They were signed by state officers, commissioners, committees, by persons who were agents of the state, and acted for the state, not for themselves.

The Court cannot but be familiar with Story's Commentary on the Constitution; which gives the most clear, condensed, and accurate view of these bills, their nature and effects, which is within the com-

pass of my reading. I use it as one of my guides in this argument. 3 Story's Com. 222.

They were promises by the agent that the state would pay the amount mentioned, on demand, or at a fixed day.

They had a fund provided for their redemption, which those who authorized them considered sufficient to secure their payment; generally taxes, or some portion of the revenue belonging to the state. The sufficiency of this fund was of no importance, as to their character as bills of credit. It almost always failed, except in case of the state, to which I have before referred; but in all cases the resort was to the funds and the credit of the state.

They were permitted to pass as the citizens should estimate them; or they were forced into circulation by legislative command, by tender laws.

They were circulated as money, and in every instance which can be found, they promised payment in gold and silver, in specie, or in current money, which meant gold and silver. In all cases they were bills of credit and paper money; and the states cannot now emit any thing in their resemblance, or having their object. In all their forms they were within the mischief to be remedied. See Craig v. Missouri.

The adverse counsel, to enable the bills of the Commonwealth's Bank to escape the denunciation, have given us four tests, by which they are to be tried; and without which, they are not to be taken as bills of credit, within the meaning of the Constitution.

These are, 1. That they were issued by and in the name of the state. A more true description would be, that they were issued by officers or agents of the state, for and on behalf of the state. The form given in 4 Peters, 453, was general. It was the certificate of the officer; his promise that the state would pay. I admit that the person signing them must be an officer or agent of the state, and promise for the state; he must represent the state, but the form in which he does it, is of no importance. " Due at the treasury of the state 20 dollars," and signed by the person authorized to sign it; is as much a bill on the credit of the state, as if the most precise form was used. And it matters not what the treasury or place where it is to be paid, is; a bank, or the treasurer's house. It is the place where funds of the state are kept; and that is the treasury, call it by what name you will. It does not cease to be the treasury, because you call it a bank. And if the promise is made by the agent, that he will pay, it does not thereby cease to be binding on the state; if the

money out of which he was to pay, is the money of the state, and not his own.   Forms cannot conceal the substance of the transaction, nor divert its obligation from the real debtor.

2. That they were to supply the place of a circulating medium. There is, in this case, no object in debating this test.   It is emphatically admitted that the notes in question were designed to circulate as money, and supply its place.

3. There was no compulsory process to enforce payment.   Is it not perfectly apparent that there was in all these cases, the same process as upon all other contracts by the state?   Besides, when the provision was inserted in the constitution, the states could be sued. This was the early doctrine, and the constitution was amended to take away the suability of states.   But to relieve this present case from the application of this test, it must be shown, that the officers or agents who have been interposed between the holder of the notes and the state itself, can be sued, and compelled to pay, whether the state will it or not.   A suit against them is mockery, unless the judgment can be enforced against those who own the funds.   When the law is examined. the value of this effort to evade the constitution will be apparent.

4. That for the bills of credit before the constitution, no adequate provision was made for their redemption.   This was not believed to be the case, at the time of any of the emissions.   A fund was almost always provided.   Whether sufficient or not was matter of opinion; and they only were to judge of its sufficiency, who authorized them. It was to arise from taxes, excises, imposts, specified property, from some source of revenue to the state:   That they were found to fail, does not alter the fact.   It will scarcely be pretended that the character of the paper, as bills of credit, depended on the accuracy of judgment of those who set apart the sinking fund.   Much less would that character be changed, if the fund should unexpectedly fail.   This would convert them into bills of credit, according as the value of the fund was enhanced or depreciated.   The counsel will find it difficult to sustain this position by any reference to history; and if the insufficiency of the fund is to be decided by the depreciation of the paper resting upon it; which is the only test which we or this Court can apply; then the defendant in error can have little hope.   The notes of the Commonwealth's Bank depreciated fifty per cent., notwithstanding the fund provided for them.

The result of these tests is. that the qualities of the paper in ques-

.tion cannot be confined to the points urged against us. Their true description is, paper money—bills resting on the funds, faith, and credit of the state—issued by agents of the state, promising that they shall be paid, whether out of a specific fund or not; having the same means to enforce payment as other contracts of the state, and designed to pass as money, to relieve the wants of the government, or its citizens.

It will at once be perceived, that neither this description, nor any argument now urged, can interfere with, or be made to deny the right of a state to borrow money and give its acknowledgment of the debt. If it be honestly and truly a loan, and the acknowledgment intended to secure its payment, no objection exists. The bills of credit of the colonies were not loans, nor certificates of loans. They were the paper money—the circulating medium of the times. It is the business of a court to look at the real object; and mere matters of form, or the name by which any paper or instrument is called, will not, with them, decide its character. If a state, not in debt, not wanting money to discharge its obligations, issues notes admitting that it owes, and does this to relieve its citizens and create money for circulation, shall the finesse succeed? Shall the constitution of the Union be overthrown by chicanery; and by mere names given to acts? Or rather shall it not operate upon the acts themselves, and be enforced according to its obvious import and meaning? This is a matter not to be reasoned before this Court.

I am now prepared to examine the law of Kentucky creating the Bank of the Commonwealth, and to apply its provisions to the constitution. It will be found to authorize the emission of bills which have every characteristic of the bills of credit of former days. Its preamble develops its object, and the mode of accomplishing it. It is in these words: "Whereas, it is deemed expedient and beneficial to the state, and the citizens thereof, to establish a bank on the funds of the state, for the purpose of discounting paper, and making loans for longer periods than has been customary, and for the relief of the distresses of the community; therefore, be it enacted," &c.

The object was not to borrow money for the state. This cover, which was unsuccessfully attempted in Craig v. Missouri, cannot be resorted to here. The government of Kentucky had no debt; no necessity to borrow money to supply her wants.

The object was the relief of the distresses of the community; the mode of relief, was to make loans to them of money, with which to

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

pay debts and make purchases. Her motive was similar to that which produced all the old paper money. She had not as good an apology as Massachusetts and the other colonies had, at the commencement of the eighteenth century. They issued their bills to enable them to raise the forces with which to fight the battles of the country; or to pay them on their return from their gallant, but often unsuccessful enterprises. Their motive was to pay a debt of the government: to meet its obligations. Here it was to provide money for the people of the state.

The mode of providing relief was by a bank; to issue money in the precise form of all other bank paper, and to answer the purposes of all other bank paper. And it was no new mode of issuing bills of credit. There is one example, and that not the least objectionable among the multitude, of its use before this. South Carolina, I think, in the war with the Tuscaroras, adopted this very mode; created a bank, and issued paper money. See 1 Hist. of S. C., 204. The two are alike in all essential particulars; and yet no man has ever supposed that the notes of the South Carolina Bank were not the kind of bills of credit which are admitted here, in argument, to be paper money, and to be unconstitutional.

The provisions of the law and its supplement, show that the plan was to equalize this money, as money, among the people. The eleventh section divides the capital among the counties, in proportion to their taxes. The twenty-first section, and the supplement, p. 165, creates a branch of the bank, in each judicial or congregational district. The eighteenth section prescribes the amount which should be loaned, and that it shall not be for longer than one year; nor be loaned for any purpose but to pay debts and purchase stock and produce. In plain words, it was money; money issued and loaned by the bank, to be used as money.

It is not my purpose to deny the duty of the government of the state to use all appropriate and constitutional means to relieve the people, when under such distress as was then felt; but to deny the right to use the means then adopted. The Bank of Kentucky had been created many years before, and the state was one-half owner of the stock. During the war of 1812, it, like others, suffered. It stopped specie payment by order of the government; and was in that condition, when, in 1817, the state chartered more than forty new banks, requiring them to make their capital of specie, or of notes of the Kentucky Bank. They failed, as might have been expected; and

in 1819 their charters were taken away. The pressure and distress of the community were almost unsupportable. The virtue and talents of her best citizens were put in requisition; and during the sitting of the legislature in Frankfort, they met in the capitol, in the hall of legislation, to devise the proper means for relief. If I have the history correctly, one of my learned adversaries, (Mr. Clay,) was there; and, as he has done on so many other occasions, gave to the members of the legislature, and his other fellow citizens, the counsels of true wisdom. But they were not to create such a bank as that now under consideration; the constitutionality of which was, at that day, denied by a large proportion of the ablest citizens of the state. The legislature adopted other, and, as I insist, unconstitutional advice; and created money for the relief of the people; the money whose legality we contest.

The inquiries at once meet us, whose money was it? by whom was it issued? on whose credit did it rest? by whom was the fund for its redemption owned? An answer to these questions must settle our controversy. If the fund belonged to the state; if the credit was that of the state; if those who issued it were the mere agents of the state, without personal interest or responsibility; then it was the money of the state: the bills were bills of credit, emitted by the state, and fall within the constitutional denunciation. It is susceptible of demonstration, that the state and not the corporation, was every thing. The corporation was not to provide relief of itself. It was but the instrument used by the state to effect its object, by its own means and resources. The corporation was the mere form of her action; and if this form shall be found sufficient to cover and legalize the act, the constitution is, on this point, not worth the parchment on which it is written. It does not require even ordinary ingenuity to enable every state to trample upon and defy it, whenever interest or caprice may dictate.

1. Then as to the stockholders. Sec. 1. "That a bank shall be, and the same is, hereby established, in the name and on behalf of the commonwealth of Kentucky, &c." Sec. 3. "The whole capital of said bank shall be exclusively the property of the commonwealth of Kentucky, and no individual or corporation shall be permitted to own, or pay for any part of the capital of said bank." Sec. 5. The capital stock of said bank shall be two millions of dollars, (increased by supplement 22 December, 1820, to three millions of dollars,) to be raised and paid in the following manner, to wit:—"All moneys

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

hereafter paid into the treasury for the purchase of the vacant lands of the commonwealth; all moneys hereafter paid into the treasury for the purchase of land warrants; all moneys which may hereafter be raised for the sale of the vacant lands west of the Tennessee river, and so much of the capital stock owned by the state in the Bank of Kentucky, as may belong to the state, after the affairs of said bank shall be settled up, with the profits thereof, not heretofore pledged or appropriated by law; shall be exclusively appropriated to the making up the capital stock of said bank;" the treasurer, as he should receive money from these sources, to pay it over to the cashier, &c. Sec. 24. All the interest arising from the loans and discounts, which may be made by the said bank, after the payment of the necessary expenses, shall constitute and be considered as part of the annual revenue of the state, and subject to the disposition of the legislature.

Sec. 28. The treasurer was to furnish seven thousand dollars to procure plates, &c. to put the bank into operation.

Sec. 35. "That the notes of the present Bank of Kentucky shall be receivable in payment of all debts due the bank hereby established, and the revenue of this commonwealth, unappropriated at the close of the present session of the general assembly; also, the revenue hereafter collected, which may remain in the treasury unappropriated annually, shall constitute a part of the capital stock of said institution, and shall be paid over to the cashier of the bank, by the treasurer; subject to such appropriations as may be made from time to time by law.

Preliminary to the particular examination of the character of the paper issued by the bank, under this charter, and to a further discussion of the case; it is important to call the attention of the Court to the state of the questions in this case, as they are presented by the pleadings. In no propriety can the cause be decided, but upon them; and the Court will therefore look to them with their accustomed care and discrimination; before the decision is pronounced.

The pleas of the defendants, in the courts of Kentucky are, that no capital was furnished to the bank by the state of Kentucky: while the pleas refer to the provision in the charter, which direct the payment of the proceeds of certain lands, and that the funds of the state in the Bank of Kentucky, shall be paid over to the Bank of the Commonwealth, they aver that nothing was ever paid. They also aver, that the whole of the profits of the bank belonged to the state, and were received by the state. The plaintiffs demurred to

these pleas, and thus they admit every and all the facts set forth in them. The case is therefore on the pleadings: a bank was established for the sole and exclusive benefit of the state of Kentucky, for the exclusive profit of the state: and no capital was furnished by the state, none was paid into the bank. The state appointed the officers of the bank, and they issued notes in the form of bank notes. These notes were circulated as money, and were the consideration for the note on which this suit was brought. The law directed, that certain funds should be handed over to the corporation, which were to form the capital, but the law was not complied with. The credit of the state pledged by the provisions of the charter, directing the appropriation of these funds, was, therefore, the only pledge for the redemption of the bills of the bank.

If the case would stand in a more favourable aspect, had the proceeds of the public lands, and the funds of the state in the Bank of Kentucky, been actually handed over to the president and directors of the Bank of the Commonwealth, and thus have become a capital, answerable for the debts of the institution; this is not the case before the Court. The pleas of the defendants allege the contrary, and the demurrer admits the truth of the allegations. Even had those funds been so appropriated, if any such existed, and this Court does not know they did exist; still these appropriations would have been revocable by the legislature of the state.

Where is the controlling power over the state to prevent, by subsequent legislation, the withdrawal of all the fund, at any subsequent period, and for any purpose the legislature should direct. Could the state of Kentucky have been called upon, for impairing the obligation of these contracts? Before what tribunal could such a claim have been preferred. Thus, the faith of the state was alone the basis of the bills of the bank, and the pledge for their redemption. A faith, it is not intended to impeach, or to question. The argument has no such purpose, or design.

To proceed with the general argument.

By the provisions of the law, it is clear:

1st. That the bank was established in the name, and on behalf of the state. Not in the name nor on behalf of the corporation, or any of the men belonging to or composing it. The state was the only stockholder; the only one interested in it.

2d. That all the stock, funds, profits of the bank, belonged to the

[Briscoe v The Bank of the Commonwealth of Kentucky.]

state; were, in fact, the property, the revenue, the treasure, and the treasury of the state.

3d. That the state had absolute control over this property; could appropriate every dollar of it at pleasure; and, by the 29th section, it had the power, from time to time, to alter and change the very constitution of the bank which nominally held it.

4th. No individual, not even the president and directors, owned one cent of the capital stock, or could receive, in any form, the slightest profit from it; or regulate and dispose of it otherwise than according to the pleasure of the legislature.

It is impossible to conceive a more perfect property. The corporation owned nothing. It used nothing, except as the agent and representative of the state.

Under these circumstances, can it be pretended, that notes issued upon this property, and secured by it, were the notes of the bank, and not of the state? They circulated on the faith and credit of the fund, or of the owner of the fund. To call them the notes of the corporation, is a gross perversion of the plainest truth. They were the notes of the state, and actually issued out of the treasury of the state. The covering is too thin for judicial eyes.

In the whole history of bills of credit, there is not one case more bald, so far as funds and credit are concerned.

But it has been argued that the funds were vested in the corporation, and that they were ample to secure the payment of the notes, which were payable in gold and silver; and the corporation might be sued. How were they vested in the corporation? The president and directors were, by the 2d section, made a corporation, "able and capable, in law, to have, purchase, receive, possess, enjoy and retain, to themselves and their successors, lands, rents, tenements, hereditaments, goods and chattels, of what kind, nature, or quality soever, and the same to sell, grant, alien, demise and dispose of." But when or how was their capacity in this respect satisfied or used? Were the lands from which the capital was to arise ever transferred to them? Was the state's capital in the bank of Kentucky? Never. The corporation never owned either. It was not intended that they should. The capital was to be created out of their profits, after the wants of the state were supplied. They never owned any of the property. Even the profits which might arise under the loans and the mortgages by which they were to be secured, was, after payment of the necessary expenses, to be "subject to the disposition of the legisla-

ture." See 24th sect. And their whole capacity of acquiring and holding property, was to be "subject, nevertheless, to the rules, regulations, restrictions and provisions, in this act." In other words, subject to the absolute control of the legislature; subject to the wants of the government; subject to the annual appropriations by law. None of the property was ever vested in the corporation as owners, but only as agents or trustees of the state: trustees, too, compelled to act at all times, not by the covenants in the trust, but by the command of the cestui que trust.

As to the value and sufficiency of the fund, but little need be said. It is, at best, proved only by allegations of counsel; founded upon no evidence before the Court. The lands were most uncertain in their proceeds; they might or might not produce funds to pay the notes, or form a capital. And they might at any moment have been transferred by the state, or given up; as is the fashion of the day, elsewhere, to actual settlers. The capital of 500,000 dollars in the Bank of Kentucky, and its profits, were, if possible, in a worse condition. It was previously encumbered by law, according to my recollection, to two-thirds of its amount; and was liable to further burdens. The bank had stopped payment; and its very incompetency occasioned the charter of this bank.

But if the fund was so ample, why did the notes depreciate? They fell, as the Court has been informed, fifty per cent.; and were at that point when they were loaned to the plaintiffs in error.

The truth on this point is, that the bank never had any funds. It went into operation before any part of the capital was or could be paid in; and issued its notes, and took its mortgages and other securities from the borrowers. It was created on the 29th November, 1820, and went into operation 1st May, 1821; and never, during its existence, received, from any quarter, an hundredth part of the three millions which it was authorized to emit. The position of the pleadings, as has been said, determines this fact. The plea denies that the capital was real, or the fund sufficient, and the demurrer admits the truth of the allegation; and it makes, in this, no admission contrary to the truth. The bank never had any capital except its own notes; its own promises to pay: and these, it is quite too absurd to regard as constituting capital, or giving ability to pay gold and silver.

Again. The promise was to pay gold and silver; and the promise might be, and has been enforced. In this respect, these notes are only equal to all former bills of credit. They all, without exception, pro-

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

mised in substance to pay gold and silver; they bore this undertaking on their face. But did they do it? Was it not the promise, and the failure to perform, that covered them with the mantle of fraud and imposition, and created the bitter denunciation of the people, and the constitutional prohibition of their government? And if this bank paid gold and silver, how happened it that its notes depreciated so enormously? It run the career of all its predecessors.

The reference to the payment enforced by this Court, is to the case of Com. Bank v. Wister, in 2 Pet. 324. That was the case of a deposit, not of the loan of its notes. It was the payment of money received; not of gold and silver for its promises, its bills of credit. And if, after judgment and execution, it had declined to pay, out of what would the money have been made? Of the property of the president and directors? This could not have been touched. Of the capital of the bank? It had no existence. Of the profits? These might have been appropriated by the state, and removed out of the way even of the process of this Court. Could the creditor take the lands; the stock of the Kentucky Bank; the money in deposit? He would have come, at last, to depend, as in all other like cases, on the honour, and faith, and credit of the good commonwealth of Kentucky. He might have found himself in possession of a right, without a remedy. In this respect, the promises of this agent of the commonwealth stand precisely on the ground of the old bills of credit. They were protected by funds quite as respectable and as safe as these. And some of those of the old congress, were better; for the Court will recollect, that in one instance, it pledged all the colonies.

The next argument which I am called to consider, has relation to the persons by whom the notes or bills were issued. It is said that they must be officers of the state; and I understand it to be admitted, at least not denied, that if these notes had been issued by the governor, auditor, treasurer, or a commissioner, or commissioners, appointed, as of old times, for the purpose, and to act for the state, they might be regarded as bills of the state; and, of course, bills of credit.

Upon what principle does this admission rest? The officers named; the governor, auditor, and treasurer; are not officers for this purpose. If they sign and issue bills, it is not in virtue of their offices; it is no part of their official duty: but they do it as a special duty, assigned to them by law. Might not the same duty be assigned to any other persons in the state, and they represent and be

its agents precisely in the same sense, and with the same binding obligation on their principal? It would puzzle ingenuity to define the distinction.

In answer, then, to the objection, I maintain that the president and directors of the Commonwealth's Bank were the special officers, the selected agents of the state for this duty.

They were appointed annually by the legislature, as all other officers were. Sec. 1, of principal act, page 35, and sec. 3. of supplement, page 166.

They gave bonds, not to the corporation, but to the state, as other officers do. They took an oath of office, like others. They were required to keep minutes or records of their acts, to be laid before the legislature, their creators, or before any committee of that body, (sec. 16,) that their official conduct might be known; and they were removable by the resolution of the legislature.

They were made a corporation, that is, united into one body, that they might sue and be sued. But this was solely to enable them to act as the officer or agent of the state; not to give them a right to act for themselves or others, or to give any interest in the property, or any rights other than the treasurer or auditor might have had. Suppose the treasurer of the state, for the time being, had been commanded, and been made a corporation, to issue these notes and perform these duties, and to sue and be sued; what would have been his character, and how would the notes have been regarded? He would have been the officer of the state still, and the notes, the notes of the state. I demand, then, to have the difference explained: if judgment is to be pronounced against the plaintiffs in error, and the constitutionality of this law affirmed by this tribunal.

The duty which these officers had to discharge was little more than to issue the notes from what the law calls "small change," to any amount up to 100 dollars, and take security for them; sec. 4, and sec. 16 and 17 of sup. page 170; to keep the treasury, and to account for the profits. And all this, not for themselves, but for the state.

Their loans were to be only to the government and citizens of Kentucky; and these loans were to be negotiable and payable as money. sec. 22.

But there is still another feature which makes this law unconstitutional. The money issued was made a tender by sec. 20. The

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

securities taken for loans of this money, are to be considered as of record from their date, and have priority of all mortgages and conveyances not previously recorded. The property might be sold in sixty days, and bought in; the debts for this money thus became debts of superior dignity, and were to be first paid. The notes were to be received for taxes and dues to government, and for county levies, for officers' fees and salaries. And by an act of 25th December, 1820, which may be regarded as contemporaneous with the charter, executions were suspended for two years, unless the creditor would endorse thereon that these notes would be received in payment; and if a sale took place, it must be with a credit of two years. The law thus enforced the receipt of these bills of credit as legal currency. The constitution intended by its prohibition to forbid all interference with the legal currency. A stay for two years, made it a tender for two years. The power which could do this for two, could do it for twenty years. But my object in referring to these provisions is to draw from them the character which the state meant to give to the money. It clearly regarded these notes as money; and meant to make them a legal currency among its citizens, in virtue of its own powers and credit, the precise object of all the old laws authorizing bills of credit. When did any state do this in regard to bills of corporations or individuals? Had they been the property of the corporation, would they have been thus protected? Would it not have been a gross violation of that plain provision of the constitution, that forbids the impairing of contracts? Indeed, if the two acts of 29th November, and 25th December, can be regarded as contemporaneous, and parts of the same system; that provision of the constitution applies to this law with irresistible force.

The attempt has thus been made to investigate the meaning of the constitution and the provisions of the law of Kentucky, and compare them; and the result which seems to have been reached is respectfully submitted. The constitution of the United States forbids a state to issue bills resting upon its funds and credit; and is not to be evaded by mere finesse, and forms, and names. It looks to the substance. The notes of the Commonwealth Bank were the notes of the state, issued by its officers for the state; relying for redemption on the property and faith of the state; and circulated for the profit of the state, and not of the bank, or of any individual citizens. The law then was in violation of the constitution, and is void.

But does the case rest on argument and illustration? It has already

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

been decided. I have regarded the case of Craig v. Missouri, as conclusive of the judgment of this Court upon the question involved here. Not only is that judgment, as pronounced by Chief Justice Marshall, clear and explicit; but the grounds assumed by the dissenting judges confirm the principles now advocated.

That case is before the Court, and I can hope to add nothing to its force; but I may suggest that the grounds of doubt with the dissenting judges do not exist in this case.

I am unable to perceive a distinction between the cases, which will justify the condemnation of the Missouri paper, and the support of that of Kentucky; unless it be that the former was signed and issued under the authority of law, by persons called auditor and treasurer; and the latter was signed and issued under the authority of law by persons called The Commonwealth Bank of Kentucky: a distinction without a difference. Both were by agents of the state, acting for the state; and the acts were thus acts of the state. I am yet to understand how a state can do that by a corporation, which it cannot do by other agency. If that be the principle, its annunciation from a tribunal of justice, will give new light upon constitutional law to the people of this country.

I have presented the argument, and do not now turn aside to inquire into the conduct of the state, or the gains she may have made by the issuing and burning of her paper. If she had taken mortgages on the lands of all her citizens for her depreciated paper, and brought them all to her granaries, as Joseph did in Egypt; it is a matter to be settled between her and them. If she has made money out of them, they must seek the appropriate satisfaction.

Nor do I detain the Court by balancing moral results between her issue of depreciated paper, and the plaintiffs in error refusing to pay still more, after they have already paid more than what they received was worth. The only morality which is to be regarded in argument before, or in its decision, by this high tribunal; is that prescribed by the constitution and laws of the country. It is, in this day, the safe morality, every where.

I ask for their vindication, and fear no consequences.

The disastrous day which my most eloquent opponent depicted, will be found, not when any constitutional restraint shall be enforced either on individuals or states; but when the commands of the constitution shall be disregarded; and this last shield for its protection shall show itself too weak to bear the weapons which are hurled

against it.   Believing that that time has not yet arrived, I confidently anticipate its support, by the judgment of the Court in favour of the plaintiffs in error.

Mr. Justice M'LEAN, delivered the opinion of the Court.

This case is brought before this Court, by a writ of error from the court of appeals of the state of Kentucky; under the 25th section of the judiciary act of 1789.

An action was commenced by the Bank of the Commonwealth of Kentucky, against the plaintiffs in error, in the Mercer circuit court of Kentucky, on a note for 2,048 dollars 37 cents, payable to the president and directors of the bank; and the defendants filed two special pleas, in the first of which oyer was prayed of the note on which suit was brought, and they say that the plaintiff ought not to have, &c. because the note was given on the renewal of a like note, given to the said bank; and they refer to the act establishing the bank, and allege, that it never received any part of the capital stock specified in the act; that the bank was authorized to issue bills of credit, on the faith of the state, in violation of the constitution of the United States.   That, by various statutes, the notes issued were made receivable in discharge of executions, and if not so received, the collection of the money should be delayed, &c.; and the defendants aver, that the note was given to the bank on a loan of its bills, and that the consideration, being illegal, was void.

The second plea presents, substantially, the same facts.   To both the pleas, a general demurrer was filed; and the court sustained the demurrer, and gave judgment in favour of the bank.   This judgment was removed, by appeal, to the court of appeals, which is the highest court of judicature in the state, where the judgment of the circuit court was affirmed; and being brought before this Court by writ of error, the question is presented whether the notes issued by the bank are bills of credit, emitted by the state, in violation of the constitution of the United States.

This cause is approached, under a full sense of its magnitude. Important as have been the great questions brought before this tribunal for investigation and decision, none have exceeded, if they have equalled, the importance of that which arises in this case.   The amount of property involved in the principle, is very large; but this amount, however great, could not give to the case the deep interest which is connected with its political aspect.

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

There is no principle on which the sensibilities of communities are so easily excited, as that which acts upon the currency; none of which states are so jealous, as that which is restrictive of the exercise of sovereign powers. These topics are, to some extent, involved in the present case.

It does not belong to this Court to select the subjects of their deliberations; but they cannot shrink from the performance of any duty imposed by the constitution and laws.

The definition of the terms bills of credit, as used in the constitution, is the first requisite in the investigation of this subject; and if this be not impracticable, it will be found a work of no small difficulty. Even in standard works on the exact sciences, the terms used are not always so definite as to express only the idea intended. In works on philosophy there is, generally, still less precision of language. But in political compacts, more is often left for construction, than in most other compositions.

This results, in a great degree, from the elements employed in the formation of such compacts; certain interests are to be conciliated and protected; the force of local prejudices must be met and overcome; and habits and modes of action the most opposite, are to be reconciled. This was peculiarly the case in the formation of the constitution of the United States. And instead of objecting to it, on account of the vagueness of some of its terms; its general excellence, both as it regards its principles and language, should excite our admiration.

The terms bills of credit, in their mercantile sense, comprehend a great variety of evidences of debt, which circulate in a commercial country. In the early history of banks, it seems their notes were generally denominated bills of credit; but in modern times they have lost that designation; and are now called, either bank bills, or bank notes.

But the inhibition of the constitution applies to bills of credit, in a more limited sense.

It would be difficult to classify the bills of credit, which were issued in the early history of this country. They were all designed to circulate as money, being issued under the laws of the respective colonies; but the forms were various in the different colonies, and often in the same colony.

In some cases they were payable with interest, in others without

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

interest. Funds arising from certain sources of taxation were pledged for their redemption, in some instances; in others they were issued without such a pledge. They were sometimes made a legal tender, at others not. In some instances, a refusal to receive them operated as a discharge of the debt; in others, a postponement of it.

They were sometimes payable on demand; at other times, at some future period. At all times the bills were receivable for taxes, and in payment of debts due to the public; except, perhaps, in some instances, where they had become so depreciated as to be of little or no value.

These bills were frequently issued by committees, and sometimes by an officer of the government, or an individual designated for that purpose.

The bills of credit emitted by the states, during the revolution, and prior to the adoption of the constitution, were not very dissimilar from those which the colonies had been in the practice of issuing. There were some characteristics, which were common to all these bills. They were issued by the colony or state, and on its credit. For in cases where funds were pledged, the bills were to be redeemed at a future period, and gradually as the means of redemption should accumulate. In some instances, congress guaranteed the payment of bills emitted by a state.

They were, perhaps, never convertible into gold and silver, immediately on their emission; as they were issued to supply the pressing pecuniary wants of the government, their circulating as money was indispensable. The necessity which required their emission, precluded the possibility of their immediate redemption.

In the case of Craig et al. v. The State of Missouri, 4 Peters, 410; this Court was called upon, for the first time, to determine what constituted a bill of credit, within the meaning of the constitution. A majority of the judges in that case, in the language of the Chief Justice, say, that "bills of credit signify a paper medium, intended to circulate between individuals, and between government and individuals, for the ordinary purposes of society."

A definition so general as this, would certainly embrace every description of paper which circulates as money.

Two of the dissenting judges on that occasion, gave a more definite, though, perhaps, a less accurate meaning, of the terms bills of credit.

By one of them it was said, "a bill of credit may, therefore, be

Vol. XI.—2 R

considered a bill drawn and resting merely on the credit of the drawer, as contradistinguished from a fund constituted or pledged, for the payment of the bill." And, in the opinion of the other, it is said, "to constitute a bill of credit, within the meaning of the constitution, it must be issued by a state, and its circulation, as money, enforced by statutory provisions. It must contain a promise of payment by the state generally, when no fund has been appropriated to enable the holder to convert it into money. It must be circulated on the credit of the state; not that it will be paid on presentation, but that the state, at some future period, on a time fixed or resting in its own discretion, will provide for the payment."

These definitions cover a large class of the bills of credit issued and circulated as money, but there are classes which they do not embrace; and it is believed that no definition, short of a description of each class, would be entirely free from objection; unless it be in the general terms used by the venerable and lamented Chief Justice.

The definition, then, which does include all classes of bills of credit emitted by the colonies or states; is, a paper issued by the sovereign power, containing a pledge of its faith, and designed to circulate as money.

Having arrived at this point, the next inquiry in the case is whether the notes of the Bank of the Commonwealth were bills of credit, within the meaning of the constitution.

The first section of the charter provides, that the bank shall be established in the name and behalf of the commonwealth of Kentucky, under the direction of a president and twelve directors, to be chosen by joint ballot of both houses of the general assembly, &c. The second provides that the president and directors of the bank, and their successors in office, shall be a corporation and body politic, in law and in fact, by the name and style of the president and directors of the Bank of the Commonwealth of Kentucky, and shall be capable, in law, to sue and be sued, to purchase and sell every description of property.

In the third section it is declared, that the stock of the bank shall be exclusively the property of the commonwealth of Kentucky, and that no individual shall own any part of it.

The fourth section authorizes the president and directors to issue notes, &c.; and in the fifth section it is declared, that the capital stock

shall be two millions of dollars, to be paid as follows: "all moneys hereafter paid into the treasury for the purchase of the vacant land of the commonwealth; all moneys paid into the treasury for the purchase of land warrants; all moneys received for the sale of vacant lands west of the Tennessee river, and so much of the capital stock owned by the state in the Bank of Kentucky:" and as the treasurer of the state received these moneys from time to time, he was required to pay the same into the bank.

The bank was authorized to receive moneys on deposite, to make loans on good personal security, or on mortgages; and by the ninth section, the bank was prohibited from increasing its debts beyond double the amount of its capital.

Certain limitations were imposed on loans to individuals, and the accommodations of the bank were to be apportioned among the different counties of the state.

The president was required to make a report to each session of the legislature. The notes were to be made payable in gold and silver, and were receivable in payment of taxes and other debts due to the state. All mortgages executed to the bank, gave to it a priority. By a supplementary act it was provided, that the president and directors might issue three millions of dollars.

In 1821, an act was passed, authorizing the treasurer of the state to receive the dividends of the bank.

The notes issued by the bank were in the usual form of bank notes, in which the Bank of the Commonwealth promised to pay to the bearer on demand, the sum specified on the face of the note.

There is no evidence of any part of the capital having been paid into the bank; and as the pleas, to which the demurrers were filed, aver that no part of the capital was paid, the fact averred is admitted on the record.

It is to be regretted that any technical point arising on the pleadings should be relied on in this case; which involves principles and interests of such deep importance. Had the bank pleaded over and stated the amount actually paid into it by the state, under the charter; the ground on which it stands would have been strengthened.

As the notes of the bank were receivable in payment for land, and land warrants, and perhaps constituted no inconsiderable part of the circulation of the state; the natural operation would be for the treasurer to receive the notes of the bank, and pay them over to it, as

a part of its capital. This would be to the bank equal to a payment in the notes of other banks, as it would lessen the demand against it; leaving to the bank the securities on the original discounts.

The notes of this bank, as also the notes of the bank of Kentucky, by an act of the legislature, were required to be received in discharge of all executions by plaintiffs; and if they failed to endorse on the executions, that they would be so received; further proceedings on the judgments were delayed two years.

On the part of the plaintiffs in error, it is contended, that the provision in the constitution, that " no state shall coin money," " emit bills of credit," or · make any thing but gold and silver coin a tender in payment of debts," are three distinct powers which are inhibited to the states; and that if the bills of the Bank of the Commonwealth were substantially made a tender, by an act of the legislature of Kentucky, it must be fatal to the action of the bank in this case.

It is unnecessary to consider on this head, whether the above provision of the act of the legislature, making these notes receivable in discharge of executions, is substantially a tender law; as such a question, however it might arise on the execution, cannot reach the obligation given to the bank. If the legislature of a state attempt to make the notes of any bank a tender, the act will be unconstitutional; but such attempt could not affect, in any degree, the constitutionality of the bank. The act referred to in the present case, was not connected with the charter of the bank. So far as this act has a bearing on the bills issued by this bank, and may tend to show their proper character, it may be considered.

But the main grounds on which the counsel for the plaintiffs rely, is, that the Bank of the Commonwealth, in emitting the bills in question, acted as the agent of the state; and that, consequently, the bills were issued by the state.

That, as a state is prohibited from issuing bills of credit, it cannot do indirectly, what it is prohibited from doing directly.

That the constitution intended to place the regulation of the currency under the control of the federal government; and that the act of Kentucky is not only in violation of the spirit of the constitution, but repugnant to its letter.

These topics have been ably discussed at the bar, and in a printed argument on behalf of the plaintiffs.

That by the constitution, the currency, so far as it is composed of

gold and silver, is placed under the exclusive control of congress, is clear; and it is contended, from the inhibition on the states to emit bills of credit, that the paper medium was intended to be made subject to the same power.

If this argument be correct, and the position that a state cannot do indirectly, what it is prohibited from doing directly, be a sound one; then it must follow, as a necessary consequence, that all banks incorporated by a state are unconstitutional. And this, in the printed argument, is earnestly maintained; though it is admitted not to be necessary to sustain the ground assumed for the plaintiffs. The counsel of the plaintiffs, who have argued the case at the bar, do not carry the argument to this extent.

This doctrine is startling, as it strikes a fatal blow against the state banks; which have a capital of near four hundred millions of dollars, and which supply almost the entire circulating medium of the country. But, let us for a moment examine it dispassionately.

The federal government is one of delegated powers. All powers not delegated to it, or inhibited to the states, are reserved to the states, or to the people.

A state cannot emit bills of credit; or, in other words, it cannot issue that description of paper to answer the purposes of money, which was denominated, before the adoption of the constitution, bills of credit. But a state may grant acts of incorporation for the attainment of those objects which are essential to the interests of society. This power is incident to sovereignty; and there is no limitation in the federal constitution, on its exercise by the states, in respect to the incorporation of banks.

At the time the constitution was adopted, the Bank of North America, and the Massachusetts Bank, and some others, were in operation. It cannot, therefore, be supposed that the notes of these banks were intended to be inhibited by the constitution; or that they were considered as bills of credit, within the meaning of that instrument. In fact, in many of their most distinguishing characteristics, they were essentially different from bills of credit, in any of the various forms in which they were issued.

If, then, the powers not delegated to the federal government, nor denied to the states, are retained by the states or the people; and by a fair construction of the terms bills of credit, as used in the constitution, they do not include ordinary bank notes: does it not follow

that the power to incorporate banks to issue these notes may be exercised by a state?

A uniform course of action, involving the right to the exercise of an important power by the state governments, for half a century; and this almost without question; is no unsatisfactory evidence that the power is rightfully exercised. But this inquiry, though embraced in the printed argument does not belong to the case, and is abandoned at the bar.

A state cannot do that, which the federal constitution declares it shall not do., It cannot coin money. Here is an act inhibited in terms so precise that they cannot be mistaken. They are susceptible of but one construction. And it is certain that a state cannot incorporate any number of individuals, and authorize them to coin money. Such an act would be as much a violation of the constitution, as if the money were coined by an officer of the state, under its authority. The act being prohibited, cannot be done by a state, either directly, or indirectly.

And the same rule applies as to the emission of bills of credit by a state. The terms used here are less specific, than those which relate to coinage. Whilst no one can mistake the latter, there are great differences of opinion as to the construction of the former. If the terms in each case were equally definite, and were susceptible of but one construction, there could be no more difficulty in applying the rule in the one case than in the other.

The weight of the argument is admitted, that a state cannot, by any device that may be adopted, emit bills of credit. But the question arises, what is a bill of credit within the meaning of the constitution? On the answer of this, must depend the constitutionality or unconstitutionality of the act in question.

A state can act only through its agents; and it would be absurd to say, that any act was not done by a state which was done by its authorized agents.

To constitute a bill of credit within the constitution, it must be issued by a state, on the faith of the state, and be designed to circulate as money. It must be a paper which circulates on the credit of the state; and is so received and used in the ordinary business of life.

The individual or committee who issue the bill, must have the power to bind the state; they must act as agents, and of course do not incur any personal responsibility, nor impart, as individuals, any

credit to the paper.    These are the leading characteristics of a bill of credit, which a state cannot emit.

Were the notes of the Bank of the Commonwealth, bills of credit, issued by the state?

The president and directors of the bank were incorporated, and vested with all the powers usually given to banking institutions. They were authorized to make loans on personal security, and on mortgages of real estate.  Provisions were made, and regulations, common to all banks; but there are other parts of the charter which, it is contended, show that the president and directors acted merely as agents of the state.

In the preamble of the act, it is declared to be "expedient and beneficial to the state, and the citizens thereof, to establish a bank on the funds of the state, for the purpose of discounting paper and making loans for longer periods than has been customary; and for the relief of the distresses of the community."

The president and directors were elected by the legislature.  The capital of the bank belonged to the state, and it received the dividends.

These and other parts of the charter, it is argued, show, that the bank was a mere instrument of the state to issue bills; and that, if by such a device, the provision of the constitution may be evaded, it must become a nullity.

That there is much plausibility and some force in this argument, cannot be denied; and it would be in vain to assert that on this head, the case is clear of difficulty.

The preamble of the act to incorporate the bank, shows the object of its establishment.  It was intended to "relieve the distresses of the community;" and the same reason was assigned, it is truly said, for the numerous emissions of paper money, during the revolution, and prior to that period.

To relieve the distresses of the community, or the wants of the government, has been the common reason assigned for the increase of a paper medium, at all times and in all countries.  When a measure of relief is determined on, it is never difficult to find plausible reasons for its adoption.  And it would seem in regard to this subject, that the present generation has profited but little from the experience of past ages.

The notes of this bank, in common with the notes of all other banks in the state, and indeed, throughout the Union, with some ex-

ceptions, greatly depreciated.   This arose from various causes then existing; and which, under similar circumstances, must always produce the same result.

The intention of the legislature in establishing the bank, as expressed in the preamble, must be considered in connection with every part of the act; and the question must be answered, whether the notes of the bank were bills of credit within the inhibition of the constitution.

Were these notes issued by the state?

Upon their face, they do not purport to be issued by the state, but by the president and directors of the bank.   They promise to pay to bearer on demand the sums stated.

Were they issued on the faith of the state?

The notes contain no pledge of the faith of the state, in any form. They purport to have been issued on the credit of the funds of the bank, and must have been so received in the community.

But these funds, it is said, belonged to the state; and the promise to pay on the face of the notes was made by the president and directors, as agents of the state.

They do not assume to act as agents, and there is no law which authorizes them to bind the state.   As in, perhaps, all bank charters, they had the power to issue a certain amount of notes; but they determined the time and circumstances which should regulate these issues.

When a state emits bills of credit, the amount to be issued is fixed by law, as also the fund out of which they are to be paid, if any fund be pledged for their redemption; and they are issued on the credit of the state, which in some form appears upon the face of the notes, or by the signature of the person who issues them.

As to the funds of the Bank of the Commonwealth, they were, in part only, derived from the state.   The capital, it is true, was to be paid by the state; but in making loans, the bank was required to take good securities; and these constituted a fund, to which the holders of the notes could look for payment, and which could be made legally responsible.

In this respect the notes of this bank were essentially different from any class of bills of credit, which are believed to have been issued.

The notes were not only payable in gold and silver, on demand; but there was a fund, and, in all probability, a sufficient fund to redeem

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

them. This fund was in possession of the bank, and under the control of the president and directors. But whether the fund was adequate to the redemption of the notes issued, or not; is immaterial to the present inquiry. It is enough that the fund existed, independent of the state, and was sufficient to give some degree of credit to the paper of the bank.

The question is not whether the Bank of the Commonwealth had a large capital or a small one, or whether its notes were in good credit or bad: but whether they were issued by the state; and on the faith and credit of the state. The notes were received in payment of taxes, and in discharge of all debts to the state; and this, aided by the fund arising from notes discounted, with prudent management, under favourable circumstances, might have sustained, and it is believed did sustain to a considerable extent, the credit of the bank. The notes of this bank which are still in circulation are equal in value, it is said, to specie.

But there is another quality which distinguished these notes from bills of credit. Every holder of them could not only look to the funds of the bank for payment, but he had, in his power, the means of enforcing it.

The bank could be sued; and the records of this Court show, that while its paper was depreciated, a suit was prosecuted to judgment against it, by a depositor; and who obtained from the bank, it is admitted, the full amount of his judgment, in specie.

What means of enforcing payment from the state had the holder of a bill of credit. It is said by the counsel for the plaintiffs, that he could have sued the state. But was a state liable to be sued?

In the case of Chisholm's Executor v. The State of Georgia, in 1792, it was decided, that a state could be sued before this Court; and this led to the adoption of the amendment of the constitution, on this subject. But the bills of credit which were emitted, prior to the constitution, are those that show the mischief against which the inhibition was intended to operate. And we must look to that period, as of necessity we have done, for the definition and character of a bill of credit.

No sovereign state is liable to be sued without her consent. Under the articles of confederation, a state could be sued only in cases of boundary.

It is believed that there is no case where a suit has been brought, at any time, on bills of credit, against a state; and it is certain that

no suit could have been maintained, on this ground, prior to the constitution.

In the year 1769, the colonial legislature of Maryland passed an " act for emitting bills of credit;" in which bills to the amount of 318,000 dollars were authorized to be struck, under the direction of two commissioners, whom the governor should appoint. These persons were to be styled, " commissioners for emitting bills of credit;" by that name to have succession, to sue or be sued, in all cases relative to their trust. The commissioners were authorized to make loans on good security, to draw bills of exchange on London, under certain circumstances; and they were authorized to reissue the bills issued by them.

In the year 1712, it is stated in Hewit's History of South Carolina, the legislature of that colony established a public bank; and issued forty-eight thousand pounds, in bills of credit, called bank bills. The money was to be lent out at interest on landed or personal security.

The bills emitted under these acts are believed to be peculiar, and unlike all other emissions under the colonial governments. But a slight examination of the respective acts will show, that the bills authorized by them, were emitted on the credit of the colonies; and were essentially different from the notes in question.

The holders of these bills could not convert them into specie; they could bring no suit. The Maryland bill was as follows: " This indented bill of six dollars shall entitle the bearer hereof, to receive bills of exchange payable in London, or gold and silver at the rate of four shillings and six pence per dollar, for the said bill, according to the directions of an act of the assembly of Maryland, dated at Annapolis: signed by R. Conden and J. Clapham."

If the leading properties of the notes of the Bank of the Commonwealth were essentially different from any of the numerous classes of bills of credit, issued by the states or colonies; if they were not emitted by the state, nor upon its credit, but on the credit of the funds of the bank; if they were payable in gold and silver on demand, and the holder could sue the bank; and if to constitute a bill of credit, it must be issued by a state, and on the credit of the state, and the holder could not, by legal means, compel the payment of the bill; how can the character of these two descriptions of paper be considered as identical? They were both circulated as money; but in name, in form, and in substance, they differ.

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

It is insisted that the principles of this case were settled in the suit of Craig et al. v. The State of Missouri.

In that case the Court decided that the following paper, issued under a legislative act of Missouri, was a bill of credit, within the meaning of the constitution:

"This certificate shall be receivable at the treasury, or any of the loan offices of the state of Missouri, in the discharge of taxes or debts due to the state, in the sum of          dollars, with interest for the same, at the rate of two per cent. per annum, from the date." By the act, certificates in this form, of various amounts, were issued and were receivable in discharge of all taxes or debts due to the state; and in payment of salaries of state officers.

Four of the seven judges considered that these certificates were designed to circulate as money; that they were issued on the credit of the state; and consequently were repugnant to the constitution.

These certificates were loaned on good security, at different loan offices of the state; and were signed by the auditor and treasurer of state. They were receivable in payment of salt, at the public salt works, "and the proceeds of the salt springs, the interest accruing to the state; and all estates purchased by officers under the provisions of the act, and all the debts then due, or which should become due to the state, were pledged and constituted a fund for the redemption of the certificates;" and the faith of the state was also pledged for the same purpose.

. It is only necessary to compare these certificates with the notes issued by the Bank of the Commonwealth, to see that no two things which have any property in common, could be more unlike. They both circulated as money, and were receivable on public account; but in every other particular they were essentially different.

If to constitute a bill of credit, either the form or substance of the Missouri certificate is requisite; it is clear that the notes of the Bank of the Commonwealth, cannot be called bills of credit. To include both papers under one designation, would confound the most important distinctions; not only as to their form and substance, but also as to their origin and effect.

There is no principle decided by the Court in the case of Craig v. The State of Missouri, which at all conflicts with the views here presented. Indeed the views of the Court are sustained and strengthened, by contrasting the present case with that one.

The state of Kentucky is the exclusive stockholder in the Bank of

the Commonwealth: but does this fact change the character of the corporation? Does it make the bank identical with the state? And are the operations of the bank the operations of the state? Is the bank, the mere instrument of the sovereignty, to effectuate its designs; and is the state responsible for its acts?

The answer to these inquiries will be given in the language of this Court, used in former adjudications.

In the case of the Bank of the United States v. The Planters' Bank, 9 Wheat. 904, the Chief Justice, in giving the opinion of the Court, says, " it is, we think, a sound principle, that when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself; and takes the character which belongs to its associates and to the business which is to be transacted. Thus, many states of the Union who have an interest in banks, are not suable even in their own courts; yet they never exempt the corporation from being sued. The state of Georgia, by giving to the bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character, so far as respects the transactions of the bank; and waives all the privileges of that character. As a member of a corporation, a government never exercises its sovereignty. It acts merely as a corporator, and exercises no other power in the management of the affairs of the corporation, than are expressly given by the incorporating act."

" The government becoming a corporator lays down its sovereignty, so far as respects the transactions of the corporation; and exercises no power or privilege which is not derived from the charter."

"The state does not, by becoming a corporator, identify itself with the corporation."

In the case of the Bank of the Commonwealth of Kentucky v. Wister and others, 8 Peters, 318, the question was raised whether a suit could be maintained against the bank, on the ground that it was substantially a suit against the state.

The agents of the defendants deposited a large sum in the bank; and when the deposite was demanded, the bank offered to pay the amount in its own notes, which were at a discount. The notes were refused, and a suit was commenced on the certificate of deposite.

A judgment being entered against the bank, in the circuit court of

Kentucky; a writ of error was brought to this Court. In the court below, the defendant pleaded to the jurisdiction, on the ground that the state of Kentucky alone was the proprietor of the stock of the bank; for which reason, it was insisted that the suit was virtually against a sovereign state.

Mr. Justice Johnson, in giving the opinion of the Court, after copying the language used in the case above quoted, says, " If a state did exercise any other power in or over a bank, or impart to it its sovereign attributes, it would be hardly possible to distinguish the issue of the paper of such banks from a direct issue of bills of credit; which violation of the constitution, no doubt the state here intended to avoid."

Can language be more explicit and more appropriate than this, to the points under consideration?

This Court further say, " the defendants pleaded to the jurisdiction on the ground that the state of Kentucky was sole proprietor of the stock of the bank, for which reason it was insisted that the suit was virtually against a sovereign state. But the Court is of opinion that the question is no longer open here. The case of the United States Bank v. The Planters' Bank of Georgia, was a much stronger case for the defendants than the present; for there the state of Georgia was not only a proprietor, but a corporator. Here the state is not a corporator; since, by the terms of the act, the president and directors alone constitute the body corporate, the metaphysical person liable to suit."

If the bank acted as the agent of the state under an unconstitutional charter, although the persons engaged might be held liable, individually; could they have been held responsible as a corporation?

It is true the only question raised by the plea was, whether the bank could be sued, as its stock was owned by the state? But it would be difficult to decide this question without, to some extent, considering the constitutionality of the charter. And, indeed, it appears that this point did not escape the attention of the Court; for they say, "if a state imparted any of its sovereign attributes to a bank in which it was a stockholder, it would hardly be possible to distinguish the paper of such a bank from bills of credit;" and this, the Court say, " the state in that case intended to avoid."

These extracts cover almost every material point, raised in this investigation.

They show that a state, when it becomes a stockholder in a bank,

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

imparts none of its attributes of sovereignty to the institution; and that this is equally the case, whether it own a whole or a part of the stock of the bank.

It is admitted by the counsel for the plaintiffs, that a state may become a stockholder in a bank; but they contend that it cannot become the exclusive owner of the stock. They give no rule by which the interest of a state in such an institution shall be graduated; nor at what point the exact limit shall be fixed. May a state own one-fourth, one-half, or three-fourths of the stock? If the proper limit be exceeded, does the charter become unconstitutional; and is its constitutionality restored, if the state recede within the limit? The Court are as much at a loss to fix the supposed constitutional boundary of this right, as the counsel can possibly be.

If the state must stop short of owning the entire stock, the precise point may surely be ascertained. It cannot be supposed, that so important a constitutional principle as contended for exists without limitation.

If a state may own a part of the stock of a bank, we know of no principle which prevents it from owning the whole. As a stockholder, in the language of this Court, above cited, it can exercise no more power in the affairs of the corporation, than is expressly given by the incorporating act. It has no more power than any other stockholder to the same extent.

This Court did not consider, that the character of the incorporation was at all affected by the exclusive ownership of the stock by the state. And they say, that the case of the Planters' Bank presented stronger ground of defence, than the suit against the Bank of the Commonwealth. That in the former, the state of Georgia was not only a proprietor, but a corporator; and, that in the latter, the president and directors constituted the corporate body. And yet in the case of the Planters' Bank, the Court decided the state could only be considered as an ordinary corporator; both as it regarded its powers and responsibilities.

If these positions be correct, is there not an end to this controversy? If the Bank of the Commonwealth is not the state, nor the agent of the state; if it possess no more power than is given to it in the act of incorporation; and precisely the same as if the stock were owned by private individuals, how can it be contended, that the notes of the bank can be called bills of credit, in contradistinction from the notes of other banks?

If, in becoming an exclusive stockholder in this bank, the state imparts to it none of its attributes of sovereignty; if it holds the stock as any other stockholder would hold it; how can it be said to emit bills of credit? Is it not essential to constitute a bill of credit, within the constitution, that it should be emitted by a state? Under its charter the bank has no power to emit bills which have the impress of the sovereignty, or which contain a pledge of its faith. It is a simple corporation, acting within the sphere of its corporate powers; and can no more transcend them than any other banking institution. The state, as a stockholder, bears the same relation to the bank as any other stockholder.

The funds of the bank and its property, of every description, are held responsible for the payment of its debts; and may be reached by legal or equitable process. In this respect, it can claim no exemption under the prerogatives of the state.

And, if in the course of its operations, its notes have depreciated like the notes of other banks, under the pressure of circumstances; still it must stand or fall by its charter. In this its powers are defined; and its rights, and the rights of those who give credit to it, are guaranteed. And even an abuse of its powers, through which its credit has been impaired and the community injured, cannot be considered in this case.

We are of the opinion, that the act incorporating the Bank of the Commonwealth, was a constitutional exercise of power by the state of Kentucky: and, consequently, that the notes issued by the bank are not bills of credit, within the meaning of the federal constitution. The judgment of the court of appeals is, therefore, affirmed, with interest and costs.

Mr. Justice THOMPSON, concurring.

I concur in that part of the opinions of the Court which considers the bills issued by the bank, as not coming under the denomination of bills of credit, prohibited by the constitution of the United States, to be emitted by the states. The two great infirmities which attended the bills of credit which circulated as money, and come within the mischief intended to be guarded against by the constitutional prohibition; were, the want of some real and substantial fund being provided for their payment and redemption; and no mode provided for enforcing payment of the same.

It is true, that in many, and perhaps in most cases where they

were issued, provision was made for the redemption of the bills; so far as the promise of the state, through the medium of taxation, might be said to provide the means for payment. But this was illusory, and could in no way be enforced. The bills were always signed by some person, who, upon their face, appeared to act in the character of agent of the state; and who could not, of course, be made personally responsible for their payment; and the state was not suable under the old confederation, nor under the present constitution, even before the amendment in that respect, by citizens of the same state; and those would most likely be the persons who would be the principal holders of the bills issued by the state, of which they were citizens. There being, therefore, no means of enforcing payment of such bills, their credit depended solely upon the faith and voluntary will of the state; and were therefore purely bills of credit. But that is not the situation or character of the bills of the bank in question. There is an ample fund provided for their redemption; and they are issued by a corporation which can be sued, and payment enforced in the courts of justice, in the ordinary mode of recovering debts.

If I considered these bank notes as bills of credit, within the sense and meaning of the constitutional prohibition; I could not concur in opinion with the majority of the Court, that they were not emitted by the state. The state is the sole owner of the stock of the bank; and all private interest in it is expressly excluded. The state has the sole and exclusive management and direction of all its concerns. The corporation is the mere creature of the state, and entirely subject to its control; and I cannot bring myself to the conclusion, that such an important provision in the constitution may be evaded by mere form.

Mr. Justice STORY, dissenting.

When this cause was formerly argued before this Court, a majority of the judges, who then heard it, were decidedly of opinion that the act of Kentucky establishing this bank, was unconstitutional and void; as amounting to an authority to emit bills of credit, for and on behalf of the state, within the prohibition of the constitution of the United States. In principle it was thought to be decided by the case of Craig v. The State of Missouri, 4 Peters' R. 410. Among that majority was the late Mr. Chief Justice Marshall; a name never to be pronounced without reverence. The cause has been again argued, and precisely upon the same grounds as at the former argument. A

majority of my brethren, have now pronounced the act of Kentucky to be constitutional. I dissent from that opinion: and retaining the same opinion which I held at the first argument, in common with the Chief Justice, I shall now proceed to state the reasons on which it is founded. I offer no apology for this apparent exception to the course which I have generally pursued, when I have had the misfortune to differ from my brethren, in maintaining silence; for in truth it is no exception at all, as upon constitutional questions I ever thought it my duty to give a public expression of my opinions, when they differed from that of the Court.

The first question naturally arising in the case is, what is the true interpretation of the clause of the constitution, that "no state shall emit bills of credit." In other words, what is a bill of credit, in the sense of the constitution? After the decision of the case of Craig v. The State of Missouri, I had not supposed, that this was a matter which could be brought into contestation, at least unless the authority of that case was to be overturned; and the Court were to be set adrift from its former moorings. The Chief Justice, in delivering the opinion of the Court upon that occasion, in answer to the very inquiry said; "To emit bills of credit, conveys to the mind the idea of issuing paper, intended to circulate through the community for its ordinary purposes as money, which paper is redeemable at a future day. This is the sense in which it has been always understood." Again: "The term has acquired an appropriate meaning; and bills of credit signify a paper medium, intended to circulate between individuals, and between government and individuals, for the ordinary purposes of society." Again: "If the prohibition means any thing, if the words are not empty sounds, it must comprehend the emission of any paper medium by a state government, for the purposes of common circulation." One should suppose that this language was sufficiently exact and definite to remove all possible doubt upon the point: and it has the more weight, because it came from one, who was himself an actor in the very times when bills of credit constituted the currency of the whole country; and whose experience justified him in this exposition.

But, it seems, that this definition is not now deemed satisfactory, or to be adhered to; and a new exposition is sought, which, in its predicaments, shall not comprehend the bills in question. The arguments of the learned counsel for the bank, on the present occasion have, as it appears to me, sought for a definition, which shall exclude

any perils to their case; rather than a definition founded in the intention and language of the constitution..

It appears to me, that the true nature and objects of the prohibition, as well as its language, can properly be ascertained only by a reference to history; to the mischiefs existing, and which had existed when the constitution was formed; and to the meaning then attached to the phrase " bills of credit," by the people of the United States.

If we look into the meaning of the phrase as it is found in the British laws, or in our own laws, as applicable to the concerns of private individuals, or private corporations, we shall find that there is no mystery about the matter; and that when bills of credit are spoken of, the words mean negotiable paper, intended to pass as currency, or as money, by delivery or indorsement. In this sense, all bank notes, or, as the more common phrase is, bank bills, are bills of credit. They are the bills of the party issuing them, on his credit, and the credit of his funds; for the purposes of circulation as currency or money. Thus, for example, as we all know, bank notes payable to the bearer, (or when payable to order, indorsed in blank,) pass in the ordinary intercourse and business of life, as money; and circulate, and are treated as money. They are not, indeed, in a legal and exact sense, money; but, for common purposes, they possess the attributes, and perform the functions of money. Lord Mansfield, in Miller v. Rice, 1 Burr. 457, speaking on the subject of bank notes, observed, "that these notes are not like bills of exchange, mere securities, or documents for debts, and are not so esteemed; but are treated as money, in the ordinary course and transactions of credit and of business, by the general consent of mankind: and on payment of them, whenever a receipt is required, the receipts are always given as for money, not as for securities or notes." And, indeed, so much are they treated as money, that they pass by a will which bequeaths the testator's cash, or money, or property.

In confirmation of what has been already stated, it may be remarked, that in the charter of the Bank of England, in 5th and 6th William and Mary, ch. 20, sec. 28, an express provision is made, by which the bill or bills obligatory, *and of credit*, of the bank, are declared to be assignable and negotiable. Similar expressions are to be found in the many acts of the American States, incorporating banks; as has been abundantly shown in the citations at the bar.*

* See the Acts establishing the Bank of New York, 1791; the Bank of Albany, in New York; the Bank of Pennsylvania, 1793; the Bank of New Jersey, 1823; the

The reason is obvious why they are called bills of credit; they are intended to pass as currency, or money; and they are issued on the credit of the bank, or of other persons who are bound by them. Not but that there is a capital fund or stock for their redemption; for, in general, all banks have such a fund: but that the credit is still given to the corporation, and not exclusively to any particular fund. Indeed, in many cases, (as in Massachusetts) the private funds and credit of the corporators, are by law, to a limited extent, made responsible for the notes of banks.

Such then being the true and ordinary meaning applied to bills of credit, issued by banks and other corporations, that they are negotiable paper, designed to pass as currency, and issued on the credit of the corporation; there is no mystery in the application of the same terms to the transactions of states. The nature of the thing is not changed; the object of the thing is not changed, whether the negotiable paper is issued by a corporation or by a state. Mutato nomine, de te fabula narratur. A bill of credit, then, issued by a state, is negotiable paper, designed to pass as currency, and to circulate as money. It is distinguishable from the evidences of debt issued by a state for money borrowed, or debts otherwise incurred; not merely in form, but in substance. The form of the instrument is wholly immaterial. It is the substance we are to look to; the question is, whether it is issued, and is negotiable, and is designed to circulate as currency. If that is its intent, manifested either on the face of the bill, or on the face of the act, and it is in reality the paper issue of a state; it is within the prohibition of the constitution. If no such intent exists, then it is a constitutional exercise of power by the state. This is the test; the sure, and, in my judgment, the only sincere test, by which we can ascertain whether the paper be within or without the prohibition of the constitution. All other tests, which have hitherto been applied; and all other tests which can be applied, will be illusory, and mere exercises of human ingenuity, to vary the prohibition, and evade its force. Surely, it will not be pretended, that the constitution intended to prohibit names, and not things; to hold up the solemn mockery of warning with shadows, and suffering realities to escape its grasp? To suffer states, on their own credit, to issue floods of paper money as currency: and if they do not call them bills of credit, if they do not

Bank of Baltimore, 1795; the Bank of Virginia; the State Bank of North Carolina, 1810; the Bank of Georgia; the Bank of Kentucky, &c. &c.

give them the very form and impress of a promise by the state, or in behalf of the state; in the very form, so current, and so disastrous in former times; then they are not within the prohibition. Let the impressive language of Mr. Chief Justice Marshall on this very point, in the case of Craig v. The State of Missouri: a voice now speaking from the dead: let it convey its own admonition, and answer to the argument. " And can this (said he) make any real difference? Is the proposition to be maintained, that the constitution meant to prohibit names; and not things? That a very important act, big with great and ruinous mischief; which is expressly forbidden by words most appropriate for its description; may be performed by the substitution of a name? That the constitution, in one of its most important provisions, may be openly evaded; by giving a new name to an old thing? We cannot think so."

But the argument need not be rested here. The question here is, not what is meant by bills of credit, in a mere theoretical sense. But I trust, that I shall abundantly show, that the definition which was given in the case of Craig v. The State of Missouri, and the definition which I maintain, is the true one; stripped of all mystery, and all extraneous ingredients is the true one; confirmed by the whole history of the country: and that the true meaning of bill of credit was just as well known and understood from the past and the passing events at the time of the adoption of the constitution, as the terms, habeas corpus, trial by jury, process of impeachment, bill of attainder, or any other phrase to be found in the technical vocabulary of the constitution. And I mean to insist, that the history of the colonies, before and during the revolution, and down to the very time of the adoption of the constitution; constitutes the highest and most authentic evidence, to which we can resort, to interpret this clause of the instrument: and to disregard it, would be to blind ourselves to the practical mischiefs which it was meant to suppress; and to forget all the great purposes to which it was to be applied. I trust, that I shall be able further to show, from this very history, that any other definition of bills of credit than that given by the Supreme Court in the case of Craig v. The State of Missouri, is in opposition to the general tenor of that history; as well as to the manifest intention of the framers of the constitution.

Before I proceed further, let me quote a single passage from the Federalist, No. 44; in which the writer, in terms of strong denunciation and indignation, exposes the ruinous effects of the paper money

of the revolution, (universally in those days called by the name of bills of credit, for there was no attempt to disguise their character;) and then adds, " in addition to these persuasive considerations it may be observed, that the same reasons, which show the necessity of denying to the states the power of regulating coin; prove with equal force, that they ought not to be at liberty to substitute a paper medium instead of coin." This passage shows the clear sense of the writer, that the prohibition was aimed at a paper medium, which was intended to circulate as currency; and to that alone.

But it has been said, that bills of credit, in the sense of the constitution, are those only which are made by the act creating them a tender in payment of debts. To this argument, it might be sufficient to quote the answer of the Chief Justice, in delivering the opinion of the Court in the case of Craig v. The State of Missouri. " The constitution itself," (said he) "furnishes no countenance to this distinction. The prohibition is general. It extends to all bills of credit; not to bills of credit of a particular description. That tribunal must be bold, indeed, which, without the aid of other explanatory words, could venture on this construction. It is the less admissible in this case, because the same clause of the constitution contains a substantial prohibition to the enactment of tender laws. The constitution, therefore, considers the emission of bills of credit and the enactment of tender laws, as distinct operations; independent of each other, which may be separately performed. Both are forbidden. To sustain the one, because it is not also the other; to say, that bills of credit may be emitted, if they be not a tender of debts; is in effect, to expunge that distinct independent prohibition, and to read the clause, as if it had been entirely omitted. We are not at liberty to do this."

But, independently of that reasoning, the history of our country proves that it is not of the essence of bills of credit, it is not a part of their definition, that they should be a tender in payment of debts. Many instances, in proof of this, were given in the opinion so often alluded to. Not a single historian upon this subject alludes to any such ingredient, as essential or indispensable.

It has been said, (and it has never been denied,) that the very first issue of bills of credit by any of the colonies, was by the province of Massachusetts, in 1690. The form of these bills was; " this indented bill of ten shillings, due from the Massachusetts colony to the possessor, shall be in value equal to money, and shall be ac-

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

cordingly accepted by the treasurer and receivers subordinate to him, in all public payments, and for any stock at any time in the treasury." Then followed the date and the signatures of the committee authorized to emit them.* They were not made a tender in payment of debts, except of those due to the state. In 1702, 3 Anne, ch. 1, another emission of bills of credit for fifteen thousand pounds, was authorized in the same form: but they were not made a tender by the act; and the then duties of impost and excise were directed to be applied to the discharge of those bills, as also a tax of ten thousand pounds on polls and estates, real and personal, to be levied and collected, and paid into the treasury in 1705. A subsequent act, passed in 1712, made them a tender in payment of private debts. In 1716, art. of 3d Geo. 1, ch. 6, a further emission of one hundred and fifty thousand pounds in "bills of credit," was expressly authorized to be made in the like form; to be distributed among the different counties of the province in a certain proportion stated in the act; and to be put into the hands of five trustees in each county, to be appointed by the legislature, to be let out by the trustees on real security in the county, in certain specified sums, for the space of ten years, at five per cent per annum. The mortgages were to be made to the trustees, and to be sued for by them; and the profits were to be applied to the general support of the government. These bills were not made a tender. Now, this act is most important to show that the fact, that the bills of credit were to be let out on mortgage, was not deemed the slightest degree material to the essence of such bills. An act for the emission of bills of credit, not materially different in the substance of its provisions, had been passed in 1714, 1 Geo. 1, ch. 2. Another act for the emission of fifty thousand pounds, in bills of credit, was passed in 1720, 7 Geo. 1, ch. 9, containing provisions nearly similar; except that the trustees were to be appointed by the towns, and the profits were to be received by the towns, and a tax of fifty thousand pounds on polls and estates, was authorized to be raised to redeem the same. In 1720, the colony of Rhode Island issued bills of credit, nearly in the form of the Massachusetts bills; and they were made a tender in payment of all debts, excepting special ones; and similar bills were issued in 1710, and 1711. In 1715, another issue was authorized, to be let out by trustees and committees of towns on mortgage, for ten years. There

* See 3 Story's Comment. on the Constitution, 231, note [2.]

is no clause in the act declaring them a tender.   The same year another emission was authorized.

In 1709, the colony of Connecticut authorized an emission of bills of credit in a similar form; appropriating a tax for their redemption. There was no clause making them a tender.   Numerous other acts of the like nature, were passed between that period and 1731; some of which made them a tender, and others not.

In 1709, the colony of New York issued bills of credit, in a form substantially the same: and they were made a tender in the payment of debts, and these bills were to bear interest.   Many other emissions of bills of credit were from time to time authorized to be made in similar forms; they were generally made a tender; and generally funds were provided for their due redemption.

In 1722, the province of Pennsylvania issued bills of credit, in a form not substantially different from those of the New England states; which were delivered to trustees, to be loaned on mortgages, on land, or ground rents: and they were made a tender in payment of all debts. Other emissions, for like purposes, were authorized by subsequent laws.   In the year 1739, an emission of bills of credit was authorized by the state of Delaware, for similar purposes, and in a similar form, to be loaned on mortgages.   They were made a tender in payment of debts, and a sinking fund was provided.

In 1733, Maryland authorized an emission of bills of credit, to the amount of ninety thousand pounds, to be issued by and under the management of three commissioners, or trustees, who were incorporated by the name of "The Commissioners or Trustees for emitting Bills of Credit;" and by that name might sue and be sued, and sell all real and personal estate granted them in mortgage, &c.   These bills of credit, with certain exceptions, were to be lent out, on interest, by the commissioners or trustees, at four per cent., upon mortgage or personal security; and a sinking fund was provided for their redemption, &c., and they were made a tender in payment of debts.   Another emission was authorized in 1769; and two commissioners were appointed to emit the bills, to be called "Commissioners for emitting Bills of Credit;" and by that name to have succession, and to sue and be sued.   These bills also were to be let out by the commissioners, on security; and a fund was provided for their redemption. These bills were not made a tender.*

---

* I have been favoured with a sight of one of the original bills issued under the act of Maryland, of 1769.   It is as follows: "This indented bill of six dollars, shall

In Virginia, bills of credit were issued as early as 1755, under the name of treasury notes; which bore interest, and were made a tender in payment of debts. Emissions were subsequently made at other periods, and especially in 1769, 1771, and 1773. These three last were not made a tender. In 1778, another emission of them was authorized, which were made a tender; and a fund was pledged for their redemption. Many other issues were subsequently made, which were a tender. What demonstrates that these treasury notes were deemed bills of credit, is the fact, that by an act passed in 1777, ch. 34, it was made penal for any person to "issue or offer in payment any bill of credit, or note, for any sum of money payable to the bearer;" and that the act of 1779, ch. 24, makes it a felony for any person to steal any bill of credit, or treasury note, or "loan office certificate of the United States, or any of them;" and that the act of 1780, ch. 19, after reciting, that the exigencies of the war requires the emission of paper money, &c., authorizes the emission of new treasury notes, and proceeds to punish with death any person who shall forge " any bill of credit or treasury. note, to be issued by virtue of this act." In 1748, North Carolina authorized the emission of bills of credit, which were made a tender, and a fund was provided for their redemption; and many subsequent emissions were authorized, with similar provisions.

In 1703, South Carolina first issued bills of credit. They were to bear an interest of twelve per cent. Funds were provided for their redemption. They do not seem originally to have been made a tender. Many other acts for the emission of bills of credit were, from time to time, passed by the colony; some, if not all of which were made a tender. One of these acts, passed in 1712, was of a peculiar nature; but as I have not been able to procure a copy of it, I can only refer to it as it is stated by Hewitt, 1 Hewitt, Hist. of S. Car. 204; who says: "At this time the legislature thought proper to establish a public bank, and issued forty-eight thousand pounds in bills of credit, called bank bills, for answering the exigencies of government, and for the convenience of domestic commerce. This money was to be lent out at interest on landed or personal security; and, according to the tenor

entitle the bearer hereof to receive bills of exchange, payable in London, or gold and silver, at the rate of four shillings and six pence sterling, per dollar, for the said bill; according to the direction of an act of assembly of Maryland, dated at Annapolis, this 4th day of March, A. D. 1770.   R. Conden, J. C. Clapham." These gentlemen were, doubtless, the commissioners appointed under the act.

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

of the act for issuing the same; it was to be sunk gradually by four thousand pounds a year, which sum was ordered to be paid annually by the borrowers into the hands of the commissioners appointed for that purpose." In 1760, Georgia authorized an emission of bills of credit to be let out at interest, and mortgages were to be taken by the commissioners. These bills were made a tender. Subsequent acts for issuing bills of credit were passed; but it is not necessary to recite them.

Congress, during the revolutionary war, issued more than three hundred millions of bills of credit. The first issue was in 1775, and the confederated colonies were pledged for their redemption. None of the bills of credit issued by congress were made a tender; probably from the doubt whether congress possessed the power to make them a tender. The form of those first issued was as follows: "This bill entitles the bearer to receive          Spanish milled dollars, or the value thereof, in gold and silver, according to the resolutions of congress." The last emission was made in 1780, under the guarantee of congress, and was in the following form: "The possessor of this bill shall be paid          Spanish milled dollars by the 31st of December, 1786, with interest, in like money, at the rate of five per cent. per annum, by the state of          according to an act of the legislature of the state of          the     day of          1780." The indorsement by congress was, "The United States insure the payment of the within bill, and will draw bills of exchange annually, if demanded, according to a resolve of congress of the 18th of March, 1780." These bills were expressly required by congress to issue on the funds of the individual states established for that purpose; and the faith of the United States was pledged for their payment. They were made receivable in all public payments.

I will close this unavoidably prolix, though, in my judgment, very important review of the history of bills of credit in the colonies, and during the revolution, with a reference to the act of 24th of Geo. 2, ch. 53, 1751, for regulating and restraining the issues of paper money in New England. That act, in its prohibitory clause, expressly forbids the issue of "any paper bills, or bills of credit, of any kind or denomination whatsoever," except for certain purposes, and upon certain specified emergencies; and constantly speaks of "paper bills, or bills of credit," as equivalent expressions; thus demonstrating that the true meaning of bills of credit was paper emitted by the state, and intended to pass as currency; or, in other

Vol XI —2 U

words, as paper money. It further requires, that the acts authorizing such issues of "paper bills or bills of credit," shall provide funds for the payment thereof; and makes provisions for cases where such "paper bills or bills of credit" had been loaned out on security; and declares that "no paper currency or bills of credit," issued under the act, shall be a legal tender in payment of any private debts or contracts whatsoever.

This historical review furnishes a complete answer to every argument which has been used on the present or on former occasions; which made the nature of bills of credit depend upon any other quality, than the simple one of being for money and negotiable, and designed to pass as paper money or paper currency. When it is said that it is of the essence of "bills of credit," that they should be a legal tender, we find that many of them never were a tender. Nay, that the enormous issues by the revolutionary congress were altogether stripped of this quality. When it is said, that to constitute bills of credit, their circulation as money must be enforced by statutable provisions; we find, that in many cases, from the very nature and character of the acts, no such compulsory circulation was contemplated. They did not in their form, generally, contain any express promise on the part of the state, to pay them, whether funds were provided or not; and the same form was used in both cases. There was, indeed, in my judgment, in every case an implied obligation and promise of the state to pay them; whether funds were provided or not. When it is said, that it is not a bill of credit unless credit is given to the state on its own express promise to pay, and not when the paper is only declared to be receivable in payment of debts due to the state; that there must be a promise to pay, and not merely a promise to receive: we find, that the very first issues of bills of credit were of this very character, and contained no promise; and yet the colonial legislatures appropriated to them the very name, as their true designation. When it is said, that a bill which is payable on demand, is not a bill of credit; nor a bill which contains no promise to pay at a future day; we find, that on their face nearly all the colonial issues were without any limitation of time, and were receivable in payments to the state, immediately upon their presentation; though funds for their redemption were not provided except in futuro. The issues by congress were, with a single exception, without any limitation of time as to payment, and were to be paid in gold or silver.

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

The emission of 1780, already stated, was to be paid at a future time. But congress made no express promise to pay any of their other issues; they simply pledged the colonies for their redemption; and yet congress called them bills of credit. When it is said, that bills of credit cannot bear interest, for that disqualifies them for a paper currency; we find, that in point of fact, such bills were issued both by the colonies and by the revolutionary congress; and indeed, since, by the United States in the form of treasury notes. When it is said, that bills of credit are such only as are issued upon the mere credit of the state, and not bottomed upon any real or substantial fund for their redemption; we find, that in most cases, the colonial bills of credit were issued upon such funds; provided by the very terms of the acts. The statute of 24 Geo. 2, ch. 53, also in terms applies the very phrase, not only to bills resting on the mere credit of the state, but also to bills having suitable funds provided for their redemption. It goes further, and prohibits the colonies, in future, from issuing such bills without providing suitable funds. In short, the history of bills of credit in the colonies, conclusively establishes, that none of these ingenious suggestions and distinctions, and definitions, were or could have been in the minds of the framers of the constitution. They acted upon known facts, and not theories; and meant, by prohibiting the states from emitting bills of credit, to prohibit any issue, in any form, to pass as paper currency or paper money, whose basis was the credit, or funds, or debts, or promises of the states. They looked to the mischief intended to be guarded against in the future, by the light and experience of the past. They knew that the paper money, issued by the states, had constantly depreciated, whether funds for its redemption were provided or not; whether there was a promise to pay, or a promise to receive; whether they were payable with or without interest; whether they were nominally payable, in presenti, or in futuro. They knew that whatever paper currency is not directly and immediately, at the mere will of the holder, redeemable in gold and silver, is, and forever must be liable to constant depreciation. We know the same facts as well as they. We know that the treasury notes of the United States, during the late war, depreciated fifty per cent.; that during the period of the suspension of specie payments, by our private banks at the same period, though with capitals supposed to be ample; their bank bills sunk from fifteen to twenty-five per cent. below their nominal value. The bills of this very bank of the Commonwealth

of Kentucky, of whose solid and extensive capital we have heard so much; were admitted at the argument, to have sunk fifty per cent. from their nominal value. The framers of the constitution could not, without irreverence, (not to use a stronger phrase) be presumed to prohibit names and not things; to aim a blow at the artificial forms in which paper currency might be clothed, and leave the substance of the mischief untouched and unredressed; to leave the states at liberty to issue a flood of paper money, with which to inundate the community, upon their own sole credit, funds and responsibility; so always, that they did not use certain prescribed forms of expression. If the states were to possess these attributes in ample sovereignty, it was worse than useless to place such a prohibition in the front of the constitution. It was holding out à solemn delusion and mockery to the people, by keeping the faith of the constitution to the ear, and breaking it to the sense. My judgment is, that any such interpretation of the constitution would be as unsound, as it would be mischievous. The interpretation for which I contend, is precisely that which was maintained by this Court in the case of Craig v. The State of Missouri; where all these ingenious suggestions, distinctions and definitions, to which I have alluded, were directly overruled. I might indeed have spared myself some labour in these researches, if I had not considered that case as in some measure assailed in the present decision; if, indeed, it is not shaken to its very foundation.

The next question in the case is, whether the act of Kentucky establishing this bank is unconstitutional, by authorizing an emission of bills of credit in the shape of the bank bills or notes of that bank, within the prohibition of the constitution. The argument is, that the state cannot do that indirectly, which it cannot consistently with the constitution do directly; and that the bank corporation is here the sole and exclusive instrument of the state; managing its exclusive funds, for its exclusive benefit, and under its exclusive management.

Even this obvious principle, that the state cannot be permitted indirectly to do, what it is directly prohibited to do by the constitution, has been denied on the present occasion; upon what grounds of reasoning, I profess myself incapable of comprehending. That a state may rightfully evade the prohibitions of the constitution, by acting through the instrumentality of agents in the evasion, instead of acting in its own direct name, and thus escape from all its constitutional obligations; is a doctrine to which I can never subscribe: and which, for the honour of the country, for the good faith and integrity

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

of the states, for the cause of sound morals, and of political and civil liberty, I hope may never be established. I find no warrant for any such doctrine in the case of Craig v. The State of Missouri; either in the opinion of the Court, or in that of the dissentient judges.

The other part of the argument, from which the conclusion is drawn that the act is unconstitutional, requires a more extended consideration. But before proceeding to that, it is proper to notice the statement at the bar, that the point of the constitutionality of this act has been already decided by this Court. If so, I bow to its authority. I am not disposed to shake, even if I could, the solemn decisions of this Court, upon any great principles of law; and, a fortiori, not that which respects the interpretation of the constitution itself. But I shall require proof before I yield my assent that the point has been so decided. The case relied on is the Bank of the Commonwealth of Kentucky v. Wister, 2 Peters' R. 318. In my judgment, that case justifies no such conclusion. It was not even made or suggested in the argument. It was not touched by the judgment of the Court. What was that case? Wister brought a suit in the circuit court of the United States in Kentucky, against the bank, to recover a sum deposited in the bank. The bank filed a plea to the jurisdiction of the Court; alleging that the bank was a body corporate, established by an act of the legislature of Kentucky, and "that the whole capital stock of the said corporation, is exclusively and solely the property of the state, and that the state in her political sovereign capacity as a state, is the sole and exclusive and only member of the corporation." The Court decided, that the suit was rightfully brought against the corporation, and was within the jurisdiction of the circuit court. Why? Because the Court were of opinion, that though the corporation was created by the state, the state was not even a member of the corporation. "The president and directors alone, (said Mr. Justice Johnson, in delivering the opinion of the Court) constitute the body corporate, the metaphysical person liable to suit. Hence by the laws of the state itself, it is excluded from the character of a party, in the sense of the law, when speaking of a body corporate." And in confirmation of this view of the matter, a passage was cited from the opinion in the United States Bank v. The Planters' Bank of Georgia, 9 Wheat. R. 904. The learned judge then said, and this is the comment, on which so much reliance has been placed—"To which it may be added, that if a state did exercise any other power in or over a bank, or impart to it its sovereign attributes, it would be hardly

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

possible to distinguish the issue of the paper of such banks from a direct issue of bills of credit, which violation of the constitution no doubt the state here intended to avoid." Now this language imports, at most, only that a case might have existed, which would have been a violation of the constitution, but which was admitted not to be the case before the Court; that is, where the state imparted its sovereign attributes to the corporation. The Court do not say, that the constitution of the United States had not been violated by the issue of the bank bills; for that question was never presented for their consideration: but only say, that the state did not intend to violate the constitution, and did not intend to communicate its sovereign attributes. Neither the facts of the confession, the declaration, nor the plea to the jurisdiction, in any manner, raised or could raise any such question. The corporation, as such, was capable of suing and being sued, by the laws of Kentucky. However proper, then, the language might have been as an admonition of the danger to the bank, if their ground of objection to the jurisdiction was maintainable; it did not commit the Court in the slightest manner to any definitive opinion as to the constitutionality of its issues of bank paper.

Let us now proceed to the consideration of the charter of the bank, and ascertain whether it is a mere agent of the state, and what are the powers and authorities which are given to it as to the issues of bank bills. The act of 1820, declares in the first section, that a bank shall be, and thereby is established, "in the name and on behalf of the Commonwealth of Kentucky;" under the direction of a president and twelve directors, to be chosen by the legislature from time to time by joint ballot of both houses. The second section declares the president and directors a corporation, by the corporate name, &c., conferring on the corporation the usual powers. The third section declares that the whole capital stock of the bank shall be exclusively the property of the Commonwealth of Kentucky; and no individual or corporation shall be permitted to own or pay for any part of the capital of the bank. The fourth section declares that the president and directors shall have power to issue notes not under the denomination of one dollar, nor over one hundred dollars, signed by the president, and countersigned by the cashier. These bills or notes are, by subsequent sections, authorized to be made payable to order or to bearer, and to be negotiable accordingly; and they are declared to be receivable at the treasury, and by public officers in all payments of taxes and other debts to the state, and for county levies; and are to

be payable and redeemable in gold and silver. The capital stock of the bank is to consist of two millions of dollars, to be raised and paid as follows: all moneys paid into the treasury for the purchase of vacant lands of the state, and so much of capital stock owned by the state in the Bank of Kentucky, (which it seems had then stopped payment) as may belong to the state, after the affairs of that bank were settled up, with the profits thereof not heretofore pledged or appropriated by law. And the treasurer of the state was required, from time to time, as he received moneys, or any of these accounts, to pay them to the bank. By other sections, the bank was authorized to discount bills of exchange and notes, and to receive deposites, and to loan money on mortgage on real estate, distributing their loans in certain proportions among the citizens of the different counties; and the interest arising from all loans and discounts, after payment of expenses, was to be considered as part of the annual revenue of the state, and subject to the disposition of the legislature. The notes of the Bank of Kentucky were also receivable in payment of all debts due to the Commonwealth Bank.

Such are the principal provisions of the charter. It is clear, therefore, that the bank was a mere artificial body or corporation, created for the sole benefit of the state; and in which no other person had or could have any share or interest. The president and directors were the mere agents of the state, appointed and removable at its pleasure. The whole capital stock to be provided, consisted of the proceeds of the public lands and other property of the state, which should be paid over to the bank from time to time by the treasurer of the state. The public lands themselves, and the other funds were not originally conveyed to or vested in the corporation; but were left in the free possession of the state itself. The president and directors had no interest whatsoever in the institution, but only had the management of it, subject to the control of the state. They were not personally liable for non-payment of any of the bills, or notes, or debts of the bank; but only for their personal misconduct in any excess of issues or debts beyond double the amount of the capital stock. The state was entitled to all the profits. And though the bills and notes of the bank were declared payable in gold and silver; it seems that no human being was made directly responsible for the payment; not the president and directors in their private capacity, for they contracted no personal responsibility; and not the state, (as we have been told at the argument,) because the state had not, in its

own name, promised to pay them: nay, it is said, that these bills and notes were not even issued on the credit of the state.

Another thing is quite clear; and that is, that as the bank existed for the sole benefit of the state, and all its officers were appointed by the state, and removable at its pleasure, the state possessed an unlimited power over the corporation. The whole fund possessed by it, whether they were capital stock, or debts, or securities, or real estate, or bank notes, belonged in fact to the state. The state was the equitable owner; and might at any time, without any violation of the rights of the corporation, which was its own exclusive agent, resume and appropriate these funds to itself, and might at its own pleasure repeal and annihilate the charter; and by its sovereign legislative act become, ipso facto, the legal owner, as it was in part the equitable owner of the property, and franchise. I know of no principle of law, or of the constitution, which would have been violated by such a course; for it would have been only conferring upon the equitable owner the legal title to his own estate and property, and resuming, on the part of the principal, the funds and the business confided to his agents.

The bills or notes of the bank were to circulate as currency. That is so palpable on the face of the charter, as not to have been even questioned at the argument. They were then, stripped of mere technical forms, the bills of the state issued by the agent of the state, on the exclusive funds of the state, for the benefit and profit of the state; to circulate as currency within the state, and without any other responsibility than that of the state. In what respect then do they differ from bills of credit of the state? I can perceive none.

In the first place, it is said that they were not issued on the credit of the state; and that the state is not responsible, directly, or indirectly, for their payment. I confess, until I heard the argument at the bar, I had not supposed that any such proposition would be maintained, or could be maintainable. If these bills were not issued on the credit of the state, on whose credit were they issued? It is said, that they were issued on the credit of the corporation; and what is the corporation? A mere metaphysical being, the creature and agent of the state, having no personal existence, and incapable, per se, of any personal responsibility. The president and directors constituted that corporation, and were its sole members; and they were not personally liable. The official legal entity, called the president and directors, might be sued. But what then? The capital stock was

not vested in them, so as to be liable to be taken in execution in a suit against them. Could a creditor of the corporation seize or sell the public land, on his execution against them? No one pretends that. Suppose the state should choose, as it well might, to assume the whole agency and funds of the corporation to itself; could the creditor have any redress against the state? It is admitted that he could not have any redress, because the state is not suable.

It is said that the bills are not taken on the credit of the state; because the state has not promised, in terms, to pay them. If it had so promised, the state not being suable, the holder could here have no redress against the state. But I insist that, in equity, and in justice, the bills must be treated as the bills of the state; and that if the state were suable, a bill in equity would lie against the state, as the real debtor; as the real principal: and I say this upon principles of eternal justice, and upon principles as old as the foundations of the common law itself. How can it be truly said, that these bills were not taken on the credit of the state? Were they not to be paid out of the proceeds of the public lands, and other property of the state? Were they not receivable in payment of debts to the state, for the very reason that they were the issues of the state, for its own benefit? And was not credit given to the state, upon this very ground? It has been said at the argument, that funds were provided for the payment of the bills by the provisions of the charter; and therefore no credit to the state, ultra these funds, can be inferred. But surely the case of the old colonial bills of credit answers that position. They had funds assigned for their redemption; they in many cases had mortgages upon loans authorized to be made, as they are in the present charter; and yet the legislature called them bills of credit. The colonies did not promise to pay them; and yet they deemed them their bills of credit. Why? Because in truth, and in fact, and not upon any metaphysical authorities and fictions, they were issued upon the general credit of the state: and if the funds pledged fell short of the payment, the state was bound to redeem them. The argument on this head assumes the very matter in controversy. It assumes that the state never directly, or ultimately, held itself out as responsible for the payment of the bills; but that the holder trusted, and trusted exclusively, to the funds provided for him in the charter. Now, I deny this inference altogether. Because a state assigns funds for the payment of its debts or bills, does it follow, that the holder trusts exclusively to those funds? When a creditor takes a pledge,

or has a security for payment of his debt, does he thereby exonerate the debtor from all personal responsibility? If the agent is authorized to pledge certain funds of his principal for the payment of the debt, does that exonerate the principal from all personal liability? No such doctrine has ever yet been established to my knowledge, in any code of law; and, least of all, in the common law. On the contrary, it is at the common law held incumbent on those who insist that there has been any exclusive credit given to a fund, to establish that fact, by clear and irresistible proofs.

Suppose in this very case the corporation had circulated, as it had a right to do, its own bank bills to the amount of 5,000,000 dollars; and the funds assigned by the state, and the funds in the hands of the corporation had been wholly inadequate to redeem them; would not the state have been bound in reason, in justice, and in equity, to pay the deficiency? Would a court of equity, for a moment, tolerate any private person to escape under such circumstances, from his own responsibility for the acts and conduct of his agent, fully authorized by him? Would it not say, qui sentit commodum, sentire debet et onus? Would it be consistent with good faith, for a state to proclaim that it was not bound by the solemn obligations of its own agents, acting officially for its own exclusive benefit and interest, and upon its own funds; to the payment of debts thus justly and honestly contracted? I put these questions, because it seems to me that they can be answered only one way; and that is, by affirming the positive responsibility of the state, in foro justitiæ. The citizens must be presumed to trust, in all such cases, to the general credit and good faith of the state; and not merely to the fund contemplated or provided for their redemption. So, in similar cases, the colonies understood their own obligations. So the continental congress, and so the United States have constantly understood their own obligations. Although a fund may have been provided for payment of their bills of credit; although those bills of credit contained no direct promise of the state; although they purported, in form, to be the acts of trustees, or commissioners, or committees acting under the authority of the state; yet they well understood that the general credit of the state, for the redemption of the bills, was necessarily implied; and that without that silent necessary pledge, the bills could not, and would not have circulated at all; except upon compulsion, and by irresistible power of the government.

It is obvious that whether a state be suable or not, cannot consti-

tute a test, whether an instrument of currency issued by or on behalf
of a state, be a bill of credit or not. It may be a bill of credit, al-
though the state is not suable thereon; as was, in fact, the case with
all the anti-revolutionary bills of credit: for the colonies never were
suable. On the other hand, the state may expressly allow itself to
be sued on an instrument issued in its behalf; and yet it may not be
a bill of credit. As, for example, a state may authorize suits to be
brought for debts due by itself: and if it should issue, through its of-
ficers, a certificate of loan for money borrowed; if it were not in-
tended to pass as currency, it would not be a bill of credit.

But it is said that here the state was not only not suable on these
bank bills, but that the corporation itself was expressly suable under
the charter, and the promise to pay was made by the corporation;
and the promise being made by the corporation, it, in effect, excludes
any obligation on the part of the state. There is no magic in words.
What was this corporation in fact? A mere legal entity; a mere
agent of the state, existing for the state, with funds belonging to the
state, and dealing wholly upon the credit which these bills derived
from the state. The persons who were president and directors for
the time being, were not, (as I have already said,) personally liable
for the payment of those bills. The metaphysical personage only
was liable; and the promise, if it is not to be treated as a mere delu-
sion and phantom, was the promise of the state itself, through that
personage. Suppose the state had authorized its treasurer, in his of-
ficial capacity, and without any personal liability, to issue these very
bank bills, saying, " I, A. B., as treasurer, promise to pay," &c., and
the whole proceeds of these bills were to be for the benefit of the
state, and they were to be paid out of the funds of the state, in the
treasury; could there be a doubt that the state would, in truth, be the
real debtor? That they would be issued on its credit? That the
state would, in conscience, in common honesty, in justice, be re-
sponsible for their payment? If this would be true, in such a case,
I should be glad to know in what respect that case substantially
differs from the one before the Court? It is precisely the very case,
and in the same predicament as the bills of credit issued by Mary-
land in 1733, and 1769. There the commissioners were created a
corporation, and were to issue the bills, and were authorized to sue
and be sued; and no one ever dreamed, and least of all, the state
itself, that they were not the bills of credit of the state. It a state
can, by so simple a device as the creation of a corporation, as its own

agent, emit paper currency on its own funds, and thus escape the
solemn prohibitions of the constitution; the prohibition is a dead
letter.    It is worse than a mockery.    If we mean to give the consti-
tution any rational interpretation on this subject, we must look behind
forms and examine things.    We must ascertain for whose benefit,
on whose credit, with whose funds, for what purposes, of cur-
rency or otherwise, the instrument is created, and the agency esta-
blished.    Whether it be the issue of a treasurer of a state, or of a
corporation of a state, or of any other official personage, must be
wholly immaterial.    The real question must be, in all cases; whether,
in substance, it is the paper currency of the state?

But it has been argued, that if this bank be unconstitutional, all
state banks founded on private capital, are unconstitutional.    That
proposition I utterly deny.    It is not a legitimate conclusion from
any just reasoning applicable to the present case..    The constitution
does not prohibit the emission of all bills of credit, but only the
emission of bills of credit by a state: and when I say, by a state, I
mean by or in behalf of a state, in whatever form issued.    It does
not prohibit private persons, or private partnerships, or private cor-
porations, (strictly so called,) from issuing bills of credit.    No evils;
or, at least, no permanent evils, have ever flowed from such a source.
The history of the country had furnished no examples of that sort, of
a durable or widely extended public mischief.    And if any should
exist, it would be within the competency of the state legislatures to
furnish an adequate remedy against such issues by private persons.
In point of fact, prohibitions now exist in many states against
private banking, and against the issue of private bank paper, with
the intent that it shall pass as currency.    The mischief was not there.
It had never been felt in that direction.    It was the issue of bills of
credit, as a currency; authorized by the state on its own funds, and
for its own purposes; which constituted the real evil to be provided
against.    The history of such a currency constituted the darkest
pages in the American annals, and had been written in the ruin of
thousands, who had staked their property upon the public faith;
always freely given, and but too often grossly violated.    The great
inquiry at the adoption of the constitution, was not whether private
banks, corporate or incorporate, should exist; not whether they
should be permitted to issue a paper currency or not; but whether
the state should issue it on its own account.    The anxious inquiry
then was, quis custodiet custodes?    The answer is found in the

constitution. But it has, in my judgment, (though I am sure my brethren think otherwise,) become a mere name. Stat nominis umbra.

The states may create banks, as well as other corporations, upon private capital: and so far as this prohibition is concerned, may rightfully authorize them to issue bank bills or notes as currency: subject always to the control of congress, whose powers extend to the entire regulation of the currency of the country. When banks are created upon private capital, they stand upon that capital; and their credit is limited to the personal or corporate responsibility of the stockholders, as provided for in the charter. If the corporate stock, and that only, by the charter is made liable for the debts of the bank, and that capital stock is paid in; every holder of its bills must be presumed to trust exclusively to the fund thus provided, and the general credit of the corporation. And in such a case, a state owning a portion of the funds, and having paid in its share of the capital stock, is treated like every other stockholder; and is understood to incur no public responsibility whatsoever. It descends to the character of a mere corporator, and does not act in the character of a sovereign. That was the doctrine of this Court, in The United States Bank v. The Planters' Bank of Georgia, 9 Wheat. R. 904. "It is, (said the Court on that occasion,) we think, a sound principle, that when a government becomes a partner in any trading company it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen." In the present case, the legislature expressly prohibited any partnership, or participation with other persons in this bank. It set it up, exclusively upon the capital of the state, as the exclusive property of the state, and subject to the exclusive management of the state; through its exclusive agents. It acted, therefore, in its sovereign character and capacity; and could not, even for an instant, even in intendment of law, divest itself in the transactions of the bank of that character and capacity.

I have not thought it necessary, in the views which I have taken of this case, to resort to the state of the pleadings, though they fortify every portion of the reasoning which I have endeavoured to maintain. One of the averments in the first plea is, that the president and directors of the bank were illegally authorized, "for and on behalf of the commonwealth, and upon her credit, to make bills of credit, to emit bills or notes, to an amount not exceeding            millions

[Briscoe v. The Bank of the Commonwealth of Kentucky.]

of dollars, &c., and when so made, &c.; to emit, issue, and circulate through the community for its ordinary purposes, as money." The plea goes on to allege, that the president and directors had before the date of the note sued, on, "for, and on behalf of the commonwealth of Kentucky, and on her credit, made various bills of credit, viz: notes of various denominations, in amount, from one dollar to one hundred dollars, &c., promising therein, and thereby, to pay the person on each note mentioned, or bearer on demand, the amount therein mentioned in money, and were transferable by delivery." The demurrer admits the truth of these averments; and upon technical principles of pleading, I do not see how their conclusiveness in the present question can be avoided. But I do not rely on the state of the pleadings. I found my judgment upon the principles presented by the admitted state of the facts, that these bank bills are bills of credit, within the true intent and meaning of the constitution; that they were issued by, and in behalf of the state; upon the credit of the state; by its authorized agents; and that the issue is a violation of the constitution.

I am conscious that I have occupied a great deal of time in the discussion of this grave question; a question, in my humble judgment, second to none which was ever presented to this Court, in its intrinsic importance. I have done so, because I am of opinion, (as I have already intimated,) that upon constitutional questions, the public have a right to know the opinion of every judge who dissents from the opinion of the Court, and the reasons of his dissent. I have another and strong motive; my profound reverence and affection for the dead. Mr. Chief Justice Marshall is not here to speak for himself; and knowing full well the grounds of his opinion, in which I concurred, that this act is unconstitutional; I have felt an earnest desire to vindicate his memory from the imputation of rashness, or want of deep reflection. Had he been living, he would have spoken in the joint names of both of us. I am sensible that I have not done that justice to his opinion, which his own great mind and exalted talents would have done. But with all the imperfections of my own efforts, I hope that I have shown that there were solid grounds on which to rest his exposition of the constitution. His saltem accumulem donis, et fungar inani munere.

The judgment of the court of appeals of the state of Kentucky, is affirmed, with costs.